## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------x
In re                                 :    Chapter 11
                                      :
IMX Acquisition Corp., et al., [1]    :    Case No. 16-  12238
                                      :
              Debtors.                :    (Joint Administration Requested)
-----------------------------------------------------x
```

**MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION PURSUANT TO
SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE FOR: (I) AN ORDER
(A) APPROVING AND AUTHORIZING BIDDING PROCEDURES IN CONNECTION
WITH THE SALE OF SUBSTANTIALLY ALL THE ASSETS, (B) APPROVING AND
AUTHORIZING THE BID PROTECTIONS, (C) SCHEDULING THE RELATED
AUCTION AND HEARING TO CONSIDER APPROVAL OF THE SALE,
(D) APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES, (E) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND
(F) GRANTING RELATED RELIEF; AND
(II) AN ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,
AND OTHER INTERESTS, (B) AUTHORIZING AND APPROVING THE
DEBTORS' PERFORMANCE UNDER THE ASSET PURCHASE AGREEMENT,
(C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN OF THE DEBTORS' EXECUTORY CONTRACTS AND UNEXPIRED
LEASES RELATED THERETO, AND (D) GRANTING RELATED RELIEF**

IMX Acquisition Corp. and its above-captioned affiliated debtors and debtors in

possession (each, a "**Debtor**," and collectively, the "**Debtors**") hereby submit this motion (the

"**Motion**") for the entry of (i) an order, substantially in the form attached hereto as Exhibit A (the

"**Bidding Procedures Order**"), (a) approving and authorizing certain bidding procedures (the

"**Bidding Procedures**," substantially in the form attached to the Bidding Procedures Order as

Exhibit 1) in connection with the sale of substantially all of the Debtors' assets (the "**Assets**")

---

[1]     The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification
number are as follows:  IMX Acquisition Corp. (9838); Implant Sciences Corporation (7126);
C Acquisition Corp. (8021); Accurel Systems International Corporation (3856).  The Debtors' headquarters
are located at 500 Research Drive, Unit 3, Wilmington, MA 01887.

pursuant to that certain Asset Purchase Agreement (the "**Lead Agreement**"), substantially in the form attached hereto as Exhibit B, by and among the Debtors and L-3 Communications Corporation (the "**Lead Purchaser**"), subject to the outcome of an auction (the "**Auction**") if the Debtors receive one or more timely and acceptable Qualified Bids (as defined herein); (b) authorizing the Debtors to pay the Lead Purchaser a fee of $5,000,000 (the "**Break-Up Fee**") and an expense reimbursement of no more than $2,000,000 (the "**Expense Reimbursement**," and, together with the Break-Up Fee, the "**Bid Protections**") when and if payable pursuant to the terms of the Lead Agreement; (c) scheduling the Auction and hearing to consider approval of the sale; (d) approving procedures related to the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases (the "**Assumption and Assignment Procedures**"); (e) approving the form and manner of notice thereof; and (f) granting related relief; and (ii) an order, substantially in the form attached hereto as Exhibit C (the "**Sale Order**"), (a) authorizing the sale of such assets free and clear of liens, claims, encumbrances, and other interests, except as provided by the Lead Agreement or a Modified Lead Agreement (as defined herein); (b) approving the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases related thereto; and (c) granting related relief.  The facts and circumstances supporting this Motion are set forth in the concurrently filed *Declaration of Roger Deschenes In Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**").[2]  In further support of this Motion, the Debtors respectfully state as follows:

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

01:19370066.1

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rules 2002-1 and 6004-1.

## BACKGROUND

2.      On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue managing their properties and operating their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed in these chapter 11 cases.

3.      Additional information about the Debtors' business and the events leading to the commencement of these chapter 11 cases can be found in the First Day Declaration, which is incorporated herein by reference.

## RELIEF REQUESTED

4.     By this Motion, the Debtors request that the Court enter the Bidding

Procedures Order (i) approving and authorizing the Bidding Procedures, (ii) approving and

authorizing the payment of the Bid Protections, (iii) scheduling the Auction and hearing to

consider approval of the sale, (iv) approving the Assumption and Assignment Procedures,

(v) approving the form and manner of notice thereof, and (vi) granting related relief; and that the

Court enter the Sale Order (i) approving the sale of substantially all of the Assets free and clear

of all liens, claims, encumbrances, and other interests to the party or parties submitting the

highest or otherwise best bid for the Assets, (ii) approving the assumption, assignment, and sale

of certain executory contracts and unexpired leases (and related cure amounts), and (iii) granting

related relief.

## EVENTS LEADING TO THE SALE

5.     The Debtors comprise a leading designer and manufacturer of systems and

sensors that detect trace amounts of explosives and drugs.  Their products, which include

handheld and desktop detection devices, are used in a variety of security, safety, and defense

industries, including aviation, transportation, and customs and border protection.  The Debtors

have sold more than 5,000 of their detection products to customers such as the United States

Transportation Security Administration, the Canadian Air Transportation Security Authority, and

major airports in the European Union.

6.     As set forth in the First Day Declaration, Debtor Implant Sciences

Corporation issued a series of senior secured promissory notes between December 2008 and

March 2014 (the "**Term Notes**") to investors managed by BAM Administrative Services LLC

and Platinum Partners Value Arbitrage Fund L.P.  Each of the other Debtors is a guarantor under

the Term Notes.

7.    In August of 2015, the Debtors, in consultation with their legal and
financial advisors, began exploring several potential transactions through which to sell all or
substantial parts of their business. The Debtors reached out to over 63 potential acquiring
parties, distributing confidential information memorandums to fourteen parties who expressed an
interest in acquiring all or a portion of the Debtors' assets. As a result of the marketing process,
the Debtors received three indications of interest, two of which their advisors determined fairly
reflected the Debtors' valuation and should be advanced to the next stage of the marketing
process. As part of this marketing process, the Debtors and their advisors set up an electronic
data room with confidential business information. Potential bidders were granted access in order
to perform the necessary diligence.

8.    Several months after commencing their marketing process, the Debtors
determined that continuing operations would either require additional capital or an extension of
the maturities of the Term Notes. When it became clear that the Debtors could neither obtain
new financing nor negotiate further maturity extensions with their lenders and therefore would
not have the liquidity to continue their operations, the Debtors made the decision to sell their
Assets through these chapter 11 cases to maximize the value of their estates for their creditors
and other parties in interest. Each Debtor's respective board of directors voted to authorize their
chapter 11 filings on October 9, 2016.

9.    On October 10, 2016, the Debtors entered into the Lead Agreement with
the Lead Purchaser. The Lead Agreement evidences a value-maximizing bid of $117.5 million
(subject to working capital adjustments), plus assumption of certain liabilities by the Lead
Purchaser for substantially all of the assets of the Debtors. This consideration will be sufficient
to repay all of the Debtors' creditors, as well as provide a return to the Debtors' equity holders.

The Lead Agreement preserves the Debtors' business as a going concern and provides that substantially all of the Debtors' employees will have the ability to keep their jobs on substantially the same terms and conditions under which they are currently employed. The Lead Agreement is not conditioned on financing or the completion of due diligence.

### THE ASSET PURCHASE AGREEMENT

10.     The Debtors are seeking approval of the Lead Agreement, which will also serve as the form asset purchase agreement to be provided to all prospective bidders (each, a "**Potential Bidder**") that wish to participate in the Bidding Process (as defined herein). Among other requirements, each Potential Bidder will be required to submit an executed copy of a modified Lead Agreement (each, a "**Modified Lead Agreement**") to the Debtors reflecting the terms upon which the Potential Bidder would agree to purchase the Assets and assume certain liabilities. The Debtors propose twenty-five (25) days following entry of the Bidding Procedures Order as the deadline for submitting a Modified Lead Agreement (the "**Bid Deadline**").

11.     Certain of the key terms of the Lead Agreement are highlighted below, in accordance with Local Rule 6004-1(b):[3]

    i.      **Agreements with Management**. The Sale involves the sale of the Debtors' assets as a going concern. It is expected that the Lead Purchaser will retain substantially all of the Debtors' current employees, including certain members of management, with a base salary or hourly wage (as applicable) no less favorable than those provided immediately prior to Closing. § 6.5.

    ii.     **No Solicitation**. Except as contemplated by the Bidding Procedures Order, the Debtors shall not (i) solicit, initiate or knowingly encourage or facilitate, or cooperate with respect to, the preparation or submission of inquiries, proposals or offers from any Person (other than the Lead Purchaser) that constitute, or would reasonably be expected to lead to, an Alternative Proposal, (ii) enter into, continue or otherwise participate in

---

[3]     All capitalized terms used in this summary but not otherwise defined herein shall have the meaning ascribed to such terms in the Lead Agreement. To the extent there are any ambiguities or inconsistencies between this summary and the Lead Agreement, the Lead Agreement shall govern in all respects.

any discussions, communications or negotiations in connection with any Alternative Proposal or furnish to any Person any nonpublic information with respect to the Debtors' business, properties or assets in connection with any Alternative Proposal or (iii) enter into any agreements or other understandings (whether or not binding) regarding, or taking any action to implement or facilitate, an Alternative Proposal. During the Exclusivity Period (and except as contemplated pursuant to the Bidding Procedures Order), the Debtors shall, and shall cause their respective Representatives to, (A) immediately cease and terminate, any and all existing activities, discussions, communications or negotiations with any parties (other than the Lead Purchaser or any of its Representatives) conducted heretofore with respect to, or that could lead to, any Alternative Proposal, (B) take such action as is necessary to enforce any confidentiality provisions or provisions of similar effect to which any Debtor is a party or of which any Debtor is a beneficiary and (C) not terminate, waive, amend, release or modify any provision of any standstill agreement (including any standstill provision contained in any confidentiality or other agreement) to which it or any of its Affiliates or Representatives is a party. The Debtors shall promptly upon entry of the Sale Order instruct each Person which executed a confidentiality agreement relating to any Alternative Proposal with or for the benefit of the Debtors to promptly return or destroy all confidential information, documents and materials relating to an Alternative Proposal or to the Debtors or their businesses, operations or affairs furnished by or on behalf of the Debtors or any of its Representatives to such Person or any of its Representatives in accordance with the terms of any confidentiality agreement with such Person and terminate any "data room" or similar access of such Persons and their Representatives. § 6.3.

iii.    **Closing and Other Deadlines**.  The Closing will take place no later than the date that is the third Business Day after the satisfaction or waiver (subject to applicable Law) of the conditions (excluding conditions that, by their terms, cannot be satisfied until the Closing, but subject to the satisfaction or, where permitted, waiver of those conditions as of the Closing) set forth in Article VIII of the Lead Agreement, unless another time or date is agreed to in writing by the Debtors and the Lead Purchaser. § 1.7.  If the Closing does not occur on or before sixty (60) days after the Bankruptcy Court's entry of the Sale Order, either the Debtors or the Lead Purchaser may terminate the Lead Agreement. § 8.1.

The Debtors' and Lead Purchaser's obligations to consummate the Closing are subject to the satisfaction or waiver on or prior to the Closing Date of certain conditions, including, but not limited to, the following:

a.    Hart-Scott-Rodino Act.  The waiting period (and any extension thereof) applicable to the transactions contemplated by the

Lead Agreement under the Hart-Scott-Rodino Act shall have been terminated or shall have expired. § 7.1(b).

b. <u>Certificates</u>. The Lead Purchaser shall have received a certificate of an executive officer of each of the Debtors stating that (i) certain representations and warranties of the Debtors (as set forth in Section 7.2(a) of the Lead Agreement) are true and correct in all material respects; (ii) there has not been any Material Adverse Effect since the execution of the Lead Agreement; and (iii) such Debtor has performed in all material respects and complied in all material respects with all agreements and covenants required to be performed or complied with by it under this Agreement. §§ 7.2(a)-(c).

The Debtors shall have received a certificate of an executive officer of the Lead Purchaser stating that (i) certain representations and warranties (as set forth in Section 7.3(a) of the Lead Agreement) are true and correct, except where the failure of such does not have, and would not reasonably be expected to have, individually or in the aggregate, a Buyer Material Adverse Effect, and (ii) that the Lead Purchaser has performed in all material respects and complied in all material respects with all agreements and covenants required to be performed or complied with by it under the Lead Agreement at or prior to the Closing Date. §§ 7.3(a)-(b).

c. <u>Transaction Documents</u>. The Parties shall have delivered duly executed counterparts to the Transaction Documents and other documents and deliveries set forth in Sections 1.7(a) and 1.7(b) of the Lead Agreement. § 7.2(d); § 7.3(c).

d. <u>Permits</u>. The Lead Purchaser shall have received all Permits listed on Schedule 7.2(e) to the Lead Agreement. § 7.2(e).

e. <u>Third-Party Consents</u>. All approvals, consents, and waivers that are listed on Schedule 7.2(f) to the Lead Agreement shall have been received, and executed counterparts thereof shall have been delivered to the Lead Purchaser at or prior to Closing. § 7.2(f).

f. <u>Orders</u>. The Bankruptcy Court shall have entered each of the Bidding Procedures Order and the Sale Order, which shall be in full force and effect and shall be Final Orders. The DIP Financing Order and the DIP Agreement shall be in full force and effect. § 7.2(g); § 7.3(d).

iv.  **Record Retention**. Each Debtor will use commercially reasonable efforts to preserve and keep the Books and Records of such Debtor for periods prior to the Closing. § 6.1(b). The Lead Purchaser will use commercially reasonable efforts to preserve and keep the Books and Records of the Debtors until the later of the closing of the chapter 11 cases and the liquidation and winding up of the Debtors' estates (but in no event later than three (3) years after the Closing Date). *Id.*

v.  **Sale of Avoidance Actions**. The Purchased Assets include any avoidance, preference, or recovery claim, action, or proceeding arising under chapter 5 of the Bankruptcy Code or under any similar state or federal law, except for any Avoidance Action that could be asserted as a defense, counterclaim, or right of recoupment or setoff in respect of any Claim or Cause of Action brought, commenced or asserted by any Person against any Debtor. § 1.1; § 1.2(j).

vi.  **Limitations on Successor Liability**. By virtue of the consummation of the Sale, (i) the Lead Purchaser is not a continuation of the Debtors or their respective estates, there is no continuity between the Lead Purchaser and the Debtors, there is no common identity between the Debtors and the Lead Purchaser, there is no continuity of enterprise between the Debtors and the Lead Purchaser, and the Lead Purchaser is not a mere continuation of the Debtors or their estates, (ii) the Lead Purchaser is not holding itself out to the public as a continuation of the Debtors or their respective estates and (iii) the Sale does not amount to a consolidation or *de facto* merger of the Lead Purchaser and the Debtors and/or the Debtors' estates. Accordingly, the Lead Purchaser is not and will not be deemed a successor to Debtors as a result of the consummation of the Sale contemplated by the APA. Proposed Sale Order, § V.B.

vii.  **Sale Free and Clear of Unexpired Leases**. The Debtors will use commercially reasonable efforts to assign the Assumed Contracts (which include certain property subject to a possessory leasehold interest, license, or other right) to the Lead Purchaser pursuant to section 365 of the Bankruptcy Code. The Lead Agreement does not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party, would constitute a breach or in any way adversely affect the rights of the Lead Purchaser or the Debtors, and the Debtors, at the Lead Purchaser's expense shall use their commercially reasonable efforts to obtain any such required consent(s) as promptly as possible  If such consent is not obtained or such assignment is not attainable pursuant to section 365 of the Bankruptcy Code or the Sale Order, or if any attempted assignment would be ineffective or would impair the Lead Purchaser' rights under the Purchased Asset in question so that the Lead Purchaser would not in effect acquire the benefit of all such rights, then the Debtors, to the maximum extent permitted by applicable Law, shall act after the Closing, at the Lead Purchaser's

request, as the Lead Purchaser's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by applicable Law, with the Lead Purchaser in any other reasonable arrangement designed to provide such benefits to the Lead Purchaser. No Debtor may agree to pay any amount to obtain any consent of a third party without the Lead Purchaser's prior approval. All such obligations of the Debtors shall expire on the date that is twelve months after the Closing Date. §§ 1.5(a)-(c).

viii.    **Bid Protections**. If the Lead Agreement is terminated as set forth in Section 8.2 thereof, the Lead Purchaser shall be deemed to have earned both the Expense Reimbursement and the Break-Up Fee for the time and effort associated with initial due diligence and negotiation of the Lead Agreement and the value of serving as the Lead Purchaser for the marketing of the Purchased Assets. § 8.2.

ix.    **Relief from Bankruptcy Rule 6004(h)**. Time is of the essence in consummating the Sale. Notwithstanding the applicability of Bankruptcy Rule 6004, the terms and conditions of both the Bidding Procedures Order and Sale Order shall be immediately effective and enforceable. Bidding Procedures Order § 27; Sale Order § 29.

## THE BIDDING PROCEDURES

12.    By this Motion, the Debtors request entry of the Bidding Procedures

Order, which will, among other things, establish the following timeline:[4]

| Proposed Sale Timeline | |
|---|---|
| Deadline to Serve Sale Notice and Cure Notice | Within two (2) Business Days[5] after entry of the Bidding Procedures Order |
| Cure Objection Deadline and Assignment Objection Deadline | Within ten (10) days after service of Cure Notice |
| Bid Deadline | Twenty-five (25) days after entry of Bidding Procedures Order |

---

[4]    Capitalized terms used, but not otherwise defined, in this timeline shall have the meaning ascribed to such terms in the Bidding Procedures. To the extent there are any ambiguities or inconsistencies between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern in all respects.

[5]    As used herein, "Business Day" means any day other than Saturday, Sunday, or other day on which commercial banks in the City of New York are authorized or required by law to remain closed.

| Proposed Sale Timeline | |
|---|---|
| Sale Objection Deadline | Twenty-Five (25) days after entry of the Bidding Procedures Order |
| Deadline to Notify Qualified Bidders | One (1) Business Day after Bid Deadline |
| Auction (if required) | Two (2) Business Days after Bid Deadline |
| Notice of Successful Bidder | One (1) Business Day after Auction |
| Sale Reply Deadline | Two (2) days prior to the Sale Hearing |
| Sale Hearing | No later than five (5) days after the Bid Deadline |

13.     The Bidding Procedures are designed to maximize value for the Debtors' estates while ensuring an orderly sale process.  The Bidding Procedures describe, among other things, the procedures for parties to access due diligence, the manner in which Potential Bidders and bids become "qualified," the procedures for receipt and negotiation of bids received, the conduct of any auction, the selection and approval of any ultimately successful bidders, and related deadlines (collectively, the "**Bidding Process**").  The Bidding Process affords the Debtors a sufficient opportunity to pursue a robust sale process that will maximize the value of their Assets for the benefit of their estates.

14.     Certain of the key terms of the Bidding Procedures are highlighted below, in accordance with Local Rule 6004-1(c):[6]

  i.     **Diligence**:  The Debtors will afford any Qualified Bidder such due diligence access or additional information as the Debtors, in consultation with their advisors, deem appropriate, in their reasonable discretion, subject to contractual obligations to limit access to certain proprietary information; provided, however, the Debtors will, in their reasonable

---

[6]     All capitalized terms used in this summary but not otherwise defined herein shall have the meaning ascribed to such terms in the Bidding Procedures. To the extent there are any ambiguities or inconsistencies between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern in all respects.

discretion, make reasonable commercial efforts to provide Qualified Bidders with the same information provided to the Lead Purchaser. The Debtors must promptly advise the Lead Purchaser in the event any other Qualified Bidder receives diligence the Lead Purchaser has not previously received and shall promptly be provided with access to such diligence materials.

The due diligence period shall end on the Bid Deadline. For the avoidance of doubt, neither the Debtors nor any of their respective representatives shall be obligated to furnish any due diligence information to any person other than a Qualified Bidder.

ii.     **Bid Deadline**: A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "**Notice Parties**"): (i) counsel to the Debtors: Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019 (Attn: Paul V. Shalhoub, Esq. (pshalhoub@willkie.com)) and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801 (Attn: Matthew B. Lunn, Esq. (mlunn@ycst.com)); (ii) counsel to the Lead Purchaser: Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Attn: Sandy Qusba (squsba@stblaw.com)); (iii) counsel to Platinum Partners: Cole Schotz P.C., 1325 Avenue of the Americas, 19th Floor, New York, New York 10019 (Attn: Michael D. Sirota, Esq. (msirota@coleschotz.com)); and (iv) counsel to BAM Administrative Services LLC, Pachulski Stang Ziehl & Jones LLP, 919 N. Market St, 17th Floor, Wilmington, DE 19801, Attn: Jeffrey N. Pomerantz, Esq. (jpomerantz@pszj.com)); (v) counsel to DIP SPV I, L.P., Olshan Frome Wolosky LLP, 1325 Avenue of the Americas, New York, New York 10019 (Attn: Adam H. Friedman, Esq. and Jonathan T. Koevary, Esq. (afriedman@olshanlaw.com and jkoevary@olshanlaw.com)); (vi) counsel to any statutory committee appointed in these cases, so as to be received by the Notice Parties not later than 4:00 p.m. (prevailing Eastern Time) on the date that is twenty-five (25) calendar days after the entry of the Bidding Procedures Order (the "**Bid Deadline**").

iii.    **Qualified Bidder**: A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "**Qualified Bid**"):

a.      it fully discloses the identity of the Qualified Bidder;

b.      it states that the applicable Qualified Bidder offers to purchase, in cash, the Purchased Assets upon terms and conditions that the Debtors reasonably determine are at least as favorable to the Debtors as those set forth in the Lead Agreement, and it provides a

description of any anticipated regulatory or governmental approvals necessary to consummate the bid;

c.      it includes a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such bidder is selected as the Successful Bidder its offer shall remain irrevocable until the earlier of (a) the closing of the sale to the Successful Bidder, and (b) sixty (60) days after the entry of Sale Order.  Such writing shall guaranty performance of the Qualified Bidder by its parent entities, if any, or provide such other guaranty of performance acceptable to Debtors in their reasonable discretion;

d.      it includes confirmation that all necessary internal and shareholder approvals have been obtained prior to the bid;

e.      it includes a duly authorized and executed copy of a Modified Lead Agreement, including the purchase price for the Purchased Assets expressed in U.S. Dollars, together with all exhibits and schedules thereto and with copies marked to show any amendments and modifications to the Lead Agreement, and a proposed form of an order to approve the sale by the Bankruptcy Court, together with a copy marked to show amendments and modifications to the proposed form of Sale Order attached to this Motion; provided however, that such Modified Lead Agreement shall not include any financing or diligence conditions;

f.      it includes written evidence of sufficient cash on hand to fund the purchase price or sources of immediately available funds that are not conditioned on third party approvals or commitments, that will allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Modified Lead Agreement; such written evidence shall include the most current audited and the most current unaudited financial statements, or such other financial information as may be acceptable to the Debtors in their reasonable discretion, (collectively, the "**Financials**") of the Qualified Bidder, or, if the Qualified Bidder is an entity formed for the purpose of acquiring the Purchased Assets, the Financials of the Qualified Bidder's equity holder(s) or other financial backer(s);

g.      it provides for a cash purchase price that exceeds the aggregate cash consideration to be paid to or for the benefit of the Debtors' estates set forth in the Lead Agreement by at least $11,000,000, which represents the sum of (A) the amount of the Break-Up Fee of $5,000,000, plus (B) the Expense Reimbursement (not to exceed $2,000,000), plus (C) $4,000,000 and otherwise has a value to the

Debtors, in the Debtors' exercise of their reasonable business judgment, after consultation with their advisors, that is greater or otherwise better than the value offered under the Lead Agreement, including impact of the liabilities assumed in the Lead Agreement;

h.    it identifies with particularity which executory contracts and unexpired leases the Qualified Bidder wishes to reject and provides details of the Qualified Bidder's proposal for the treatment of related cure costs;

i.    it includes an acknowledgement and representation that the Qualified Bidder:  (A) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Modified Lead Agreement; and (D) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

j.    it includes evidence, in form and substance reasonably satisfactory to the Debtors, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Lead Agreement;

k.    it contains a detailed description of how the Qualified Bidder intends to treat current employees of the Debtors;

l.    it contains sufficient information concerning the Qualified Bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases to be assumed and assigned;

m.    it states that the Qualified Bidder consents to the jurisdiction of the Bankruptcy Court;

n.    it contains such other information reasonably requested by the Debtors; and

o.    it is received on or prior to the Bid Deadline.

iv.  **Notification to Qualified Bidders**:  The Debtors shall notify the Lead Purchaser, all Qualified Bidders, and the Notice Parties in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid other than the Lead Purchaser, whether such Qualified Bidder's bid constitutes a Qualified Bid) promptly after, and in any event on the same day as, the notification to any Qualified Bidder that their bid constitutes a Qualified Bid; provided, however, that such notification shall not be given later than one (1) business day following expiration of the Bid Deadline.

v.  **Lead Purchaser**:  Notwithstanding anything in the Bidding Procedures to the contrary, the Lead Purchaser is deemed to be a Qualified Bidder, and the Lead Agreement is deemed to be a Qualified Bid for all purposes in connection with the Bidding Procedures and the Auction, and the Lead Purchaser shall not be required to take any further action to participate in the Auction (if any) or, if the Lead Purchaser is the Successful Bidder, to be named the Successful Bidder at the Sale Hearing.  If the Debtors do not receive any Qualified Bids other than the Lead Agreement, the Debtors will not hold an Auction and the Lead Purchaser will be named the Successful Bidder on the Bid Deadline.

vi.  **Auction, Auction Procedures, and Overbids**:  If the Debtors receive one or more Qualified Bids in addition to the Lead Agreement, the Debtors will conduct an auction (the "**Auction**") of the Purchased Assets, which shall be transcribed at 10:00 a.m. (prevailing Eastern Time) two (2) business days after the Bid Deadline at the offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, or such other location as shall be timely communicated to all entities entitled to attend the Auction.  The Auction shall be conducted in accordance with the following procedures:

a.  Only the Debtors, the Notice Parties, the Lead Purchaser, any other Qualified Bidders that have submitted Qualified Bids, and/or other party as the Debtors may determine to include in their discretion, in each case along with their representatives and advisors, shall be entitled to attend the Auction (such attendance to be in person); if a party that is a creditor of the Debtors, other than those listed above, would like to attend the Auction, such party shall make a request to attend the Auction in writing (which writing may be in the form of an electronic mail) and serve such request on the Notice Parties no later than 12:00 p.m. (prevailing Eastern Time) two (2) business days prior to the date of the Auction;

b.  only the Lead Purchaser and such other Qualified Bidders that have submitted Qualified Bids on or prior to the Bid Deadline will be entitled to make any subsequent bids at the Auction; provided that all such Qualified Bidders wishing to attend the Auction must

have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person;

c.       each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

d.       at least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (a) the date of the selection of the Successful Bidder at the conclusion of the Auction, or (b) if selected as the Successful Bidder, until (1) the closing of the sale to the Successful Bidder, and (2) sixty (60) days after the entry of the Sale Order.  Prior to the start of the Auction, the Debtors will provide copies of the Qualified Bid which the Debtors believe, in their reasonable discretion, is the highest or otherwise best offer (the "Starting Bid") to the Lead Purchaser and all other Qualified Bidders;

e.       all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction;

f.       the Debtors, after consultation with their advisors, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Court entered in connection herewith, and (ii) provide that bids be made and received on an open basis, with all material terms of each bid to be fully disclosed to all other Qualified Bidders at the Auction and (iii) are disclosed to each Qualified Bidder at the Auction; and

g.       bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each a "Subsequent Bid") providing a net value to the estate of at least an additional $4,000,000 above the prior bid.  After the first round of bidding and between each subsequent round of bidding, the Debtors, after consultation with any committee counsel and counsel to Platinum Partners (together, the "Consultation Parties"), shall announce the bid (including the identity of that bidder and the value of such bid) that it believes to be the highest or otherwise best offer (the "Highest Bid").  A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a

Subsequent Bid with full knowledge of the Highest Bid. Each Qualified Bidder shall either elect to provide a higher bid or withdraw from the Auction. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Lead Purchaser), the Debtors will give effect to the Break-Up Fee and Expense Reimbursement payable to the Lead Purchaser under the Lead Agreement as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Debtors. If the Lead Purchaser bids at the Auction, the Lead Purchaser will be entitled to a "credit" for the Break-Up Fee and Expense Reimbursement. To the extent a Subsequent Bid has been accepted entirely or in part because of the addition, deletion or modification of a provision or provisions in the applicable Proposed Asset Purchase Agreement or the Lead Agreement, the Debtors will identify such added, deleted or modified provision or provisions.

vii. **Alteration of Procedures**: The Sellers, after consultation with the Consultation Parties, may modify the rules, procedures and deadlines set forth herein, or adopt new rules, procedures and deadlines that, in their reasonable discretion, will better promote the goals of these procedures, namely, to maximize value for the estates; provided that all modifications and additional rules, procedures and deadlines will be non-material, may in no event extend the dates specified in Bidding Procedures Order, including permitting the submission of Qualified Bids after the close of the Auction and otherwise not conflict with these Bidding Procedures or the Bidding Procedures Order. All such modifications and additional rules will be communicated to each of the Notice Parties, Potential Bidders and Qualified Bidders.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

15.    The Debtors believe that their executory contracts represent valuable rights necessary to the continued operation of their businesses. To that end, the Debtors seek to establish the following procedures permitting them to assume and assign these contracts to the Successful Bidder and to notify counterparties to executory contracts and unexpired leases of potential cure amounts:

i.    **Cure Notice**: The Debtors shall, within two (2) business days after the entry of the Bidding Procedures Order, serve the Cure Notice, substantially in the form attached hereto as Exhibit E, upon each non-

01:19370066.1

Debtor counterparty to each Executory Contract and Unexpired Lease and their counsel (if known). The Cure Notice shall state the date, time and place of the Sale Hearing, whether such Executory Contract or Unexpired Lease is designated to be assumed and assigned to the Lead Bidder, as well as the date by which any objection to the assumption and assignment of such Executory Contract or Unexpired Lease must be filed and served. The Cure Notice also will identify the amounts, if any, that the Debtors believe are owed to each counterparty to an Executory Contract or Unexpired Lease in order to cure any defaults that exist under such contract or lease (the "Cure Amounts") pursuant to section 365 of the Bankruptcy Code. The Cure Notice does not constitute an admission that an Executory Contract or Unexpired Lease is in fact an executory contract or unexpired lease, and the Debtors reserve any and all rights with respect to the Executory Contracts and Unexpired Leases.

ii.    **Supplemental Contracts**: Although the Debtors have made a good faith effort to identify all Executory Contracts and Unexpired Leases to be assumed and assigned in connection with the Sale, they may discover additional Executory Contracts and Unexpired Leases that the Debtors desire to assume and assign in connection therewith. Accordingly, if, at any time after the entry of the Bidding Procedures Order, the Debtors or any Qualified Bidder identify additional executory contracts or unexpired leases to be assumed and assigned as Assumed Contracts (whether before or after the closing of the sale), as applicable, the Debtors shall serve a supplemental Cure Notice (the "Supplemental Cure Notice") by facsimile, electronic transmission, hand delivery or overnight mail on the applicable non-debtor counterparty and its counsel (if known) no later than ten (10) days before the proposed effective date of the assignment. Each Supplemental Cure Notice shall (i) state the date, time and place of the Sale Hearing, (ii) state the date by which any objection to the assumption and assignment of such Assumed Contract must be filed and served, and (iii) identify the Cure Amount.

iii.   **Supplemental Objections**: Unless the non-debtor counterparty properly files and serves an objection to the Supplemental Cure Notice (the "**Supplemental Cure Objection**") on or before the earlier of ten (10) days of the date of the Supplemental Cure Notice (the "**Supplemental Cure Objection Deadline**"), the Debtors shall be authorized to assume and assign the Executory Contract or Unexpired Lease, subject to the occurrence of the Closing without further notice or order of the Court.

iv.    **No Obligation to Assume**: The inclusion of an Executory Contract or Unexpired Lease on the Cure Notice shall not obligate the Successful Bidder to take assignment of such Executory Contract or Unexpired Lease. Only those contracts that constitute Assumed Contracts pursuant to the Lead Agreement or any Successful Bidder's Modified Lead Agreement will be assumed, assigned and sold to the Successful Bidder.

v.    **Cure Objections**:  If any counterparty to an Executory Contract or Unexpired Lease objects for any reason to the Cure Amounts set forth in the Cure Notice, such counterparty must file with the Court a written objection (a "**Cure Amount Objection**") and serve such Cure Amount Objection so as to be received by the Service Parties by no later than ten (10) days after service of the Cure Notice (the "**Cure Objection Deadline**," and, together with the Assignment Objection Deadline and the Sale Objection Deadline (each as defined herein), the "**Objection Deadlines**").  Each Cure Amount Objection must set forth with specificity each and every asserted default in any Executory Contract or Unexpired Lease and the monetary cure amount asserted by such counterparty to the extent it differs from the amount, if any, specified by the Debtors in the Cure Notice.

vi.    **Disputed Cure Amounts**:  In the event that the Debtors and the non-debtor party cannot resolve the Cure Amount Objection or Supplemental Cure Objection, disputed Cure Amounts ("**Disputed Cure Amounts**") shall not be paid until the resolution of any such disputes by the Court or mutual agreement of the Debtors, the Successful Bidder and the objecting party.  Cure Amount Objections may be resolved by the Court at the Sale Hearing, or at a separate hearing either before or after the Sale Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely file and serve a Cure Amount Objection shall be forever barred from asserting that a Cure Amount is owed in an amount in excess of that set forth in the Cure Notice.  If no timely Cure Objection is filed and served with respect to an Assumed Contract, the Cure Amount identified in the Cure Notice with respect to the Executory Contracts and Unexpired Lease will be the only amounts necessary under section 365(b) of the Bankruptcy Code to cure all monetary defaults under such Seller if the Lead Purchaser (or other Successful Bidder) ultimately decides to have the applicable Assumed Contract assumed and assigned to it.  Any party failing to timely file a Cure Amount Objection shall be forever barred from objecting to the Cure Amounts and from asserting any additional cure or other amounts against the Debtors, their estates or the Successful Bidder.

vii.    **Assignment Objections**: If any counterparty to an Executory Contract or Unexpired Lease objects for any reason to the assumption and assignment of such Executory Contract or Unexpired Lease with respect to the Lead Purchaser (other than a Cure Amount Objection, an "**Assignment Objection**"), such counterparty must file and serve such Assignment Objection so as to be received by the Service Parties by no later than (the "**Assignment Objection Deadline**"): (i) ten (10) days after service of the Cure Notice; or (ii) the date otherwise specified in the Cure Notice (or, alternatively, the date set forth in the motion to assume such Assumed Contract if such contract is to be assumed and assigned after the Sale Hearing); provided that, if the Successful Bidder is not the Lead Purchaser

the Assignment Objection Deadline shall be one (1) day prior to the Sale Hearing. The Court shall make any and all determinations concerning adequate assurance of future performance under the Assumed Contracts pursuant to sections 365(b) and (f)(2) of the Bankruptcy Code at the Sale Hearing.

viii.    **Deemed Consent**:  If no objection is timely filed and served, the counterparty to an Executory Contract or Unexpired Lease shall be deemed to have consented to the assumption, assignment and sale of the Executory Contract or Unexpired Lease to any Successful Bidder if such Executory Contract or Unexpired Lease is elected by any Successful Bidder as an Assumed Contract and will be forever barred from asserting any objection with regard to such assumption, assignment and sale, except with respect to the adequate assurance of future performance by any Successful Bidder.  Any objections to any Successful Bidder's proposed form of adequate assurance of future performance must be raised at the Sale Hearing and will be resolved at the Sale Hearing.  The Cure Costs set forth in the Cure Notice shall be controlling, notwithstanding anything to the contrary in any Executory Contract or Unexpired Lease, or any other document, and the counterparty to the Executory Contract or Unexpired Lease shall be deemed to have consented to the Cure Costs and shall be forever barred from asserting any other claims related to such Executory Contract or Unexpired Lease against the Debtors or the Successful Bidder, or the property of any of them.

## Sale Notice Procedures

16.    Within two (2) business days after entry of the Bidding Procedures Order, the Debtors (or their agents) shall provide notice (substantially in the form of the notice (the "**Sales Notice**") attached to hereto as <u>Exhibit D</u>) of the Bidding Procedures Order, the Motion, the Auction, the Objection Deadlines, and the sale hearing (the "<u>Sale Hearing</u>") by first-class mail upon (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) counsel to any statutory committee appointed in these cases, (iv) the Internal Revenue Service; (v) the Debtors' thirty (30) largest unsecured creditors; (vi) counsel to the Debtors' prepetition and postpetition lenders, (vii) counsel to the Lead Purchaser; (viii) all persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Assets during the previous six months;

(ix) all entities known by the Debtors that may have a lien, claim, encumbrance, or other interest in the Assets (for which identifying information and addresses are available to the Debtors); (x) all non-Debtor parties to the Executory Contracts and Unexpired Leases; (xi) all of the Debtors' known creditors, (xii) any governmental unit known to the Debtors to have a claim in these cases; (xiii) the Office of the Attorney General in each state in which the Debtors operate; (xiv) the Office of the Delaware Secretary of State; (xv) all parties that have requested notice in these cases under Bankruptcy Rule 2002; and (xvi) all other persons as directed by the Court (collectively, the "**Sales Notice Parties**").

17.    The Debtors submit that the proposed Sales Notice, and providing notice of this Motion, the Auction and the Sale Hearing as described herein, complies fully with Bankruptcy Rule 2002 and Local Rule 2002-1 and constitutes good and adequate notice of the sale and the proceedings with respect thereto.  Therefore, the Debtors respectfully request that this Court approve the form of the Sales Notice and the notice procedures proposed above.

18.    Any and all objections, if any, to any Sale, including objections to the Auction and the selection of any Successful Bidder or Successful Bidders, must be filed by three twenty-five (25) days after entry of the Bidding Procedures Order (the "**Sale Objection Deadline**") and be served on (i) counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019 (Attn:  Paul V. Shalhoub, Esq., pshalhoub@willkie.com); (ii) counsel to the Lead Purchaser, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Attn: Sandy Qusba, Esq., squsba@stblaw.com)); (iii) counsel to any statutory committee appointed in these cases; and (iv) the Office of the United States Trustee for the District of Delaware (collectively, the

"**Objection Recipients**").  All replies to such objections must be filed by two (2) days prior to the Sale Hearing.

19.    Any party failing to timely file an objection to any Sale shall be forever barred from objecting and shall be deemed to have consented to any Sale, including the transfer of the Debtors' right, title, and interest in, to and under the Debtors' Assets free and clear of any and all liens, claims, encumbrances, and other interests in accordance with a definitive agreement for a Sale.

## LEGAL BASIS FOR RELIEF REQUESTED

**A.     Approval of the Sale and Bidding Procedures is Warranted Under Section 363 of the Bankruptcy Code**

20.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 363 does not provide a standard establishing the appropriate circumstances for bankruptcy courts to authorize the sale of a debtor's assets.  This Court, however, has held that such a sale may be authorized under section 363 of the Bankruptcy Code if the Court finds a "sound business purpose" for the sale.  *See Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147 (Bankr. D. Del. 1999) (citing *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)).  In Delaware, the business judgment rule creates a "presumption that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest".  *Stanizale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 234 (3d Cir. 2005) (citations omitted); *see also Official Comm. of Sub. Bondholders v.*

*Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding

that Delaware's business judgment rule principles have "vitality by analogy" in chapter 11).

21.     Once a court is satisfied that there is a sound business reason justifying the

sale, the court must also determine that adequate and reasonable notice has been provided to

interested parties, that the sale price is fair and reasonable, and that the purchaser is proceeding

in good faith. *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (citing *In re*

*Indus. Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 20 (Bankr. E.D. Pa.

1987)).

22.     The Debtors have shown that a valid business justification exists to sell the

Assets.   In the Debtors' judgment, a sale of their Assets in chapter 11 is the best path to

maximizing value and recoveries for their estates, creditors, and other stakeholders.  The Debtors

believe that the sale must be completed in accordance with the timeframe proposed in this

Motion to avoid a significant interruption in their businesses.

23.     The auction process and the time periods set forth in the Bidding

Procedures are reasonable under the circumstances and provide parties with sufficient time and

information necessary to formulate a bid to purchase the Assets.  The Bidding Procedures

balance the need for adequate and appropriate notice to parties in interest and to potential

purchasers with the need to sell the Debtors' assets while they have realizable value and can be

maintained as a going concern.  The Debtors undertook an extensive marketing process prior to

the Petition Date and will, in accordance with the Bidding Procedures, continue to give potential

bidders the opportunity to perform diligence and submit bids.

24.     Completion of the sale process in a timely manner will maximize the value

of Assets.  The time periods set forth in the Bidding Procedures were negotiated by the Lead

Purchaser, and completing the sale process in an expedited manner is the best means of maximizing the value of the Assets and the only means of maintaining the business as a going concern, which could enable the Debtors' employees to retain their jobs and will reduce claims against the Debtors estates.

25.    Moreover, as stated herein, the Debtors will provide notice of the sale of the Assets to all parties in interest. The Debtors believe that the proposed notice procedures are reasonable and adequate under the circumstances.

26.    At the Sale Hearing, the Debtors will provide evidence that the sale price for the Assets is fair and reasonable by showing that the Successful Bidder offered the highest or best purchase offer for the Assets. The Bidding Procedures and the Lead Agreement are designed to encourage as many bidders as possible to put forth their best offers, thus increasing the likelihood that the Debtors' Assets will be sold for the highest or best purchase price possible. In addition, the Debtors will present evidence at the Sale Hearing that the sale was a fairly negotiated, arm's length transaction in which the Successful Bidder acted in good faith, and, therefore, that the protections of section 363(m) of the Bankruptcy Code should apply.

27.    Accordingly, the Debtors request that the Court approve the proposed Sale set forth herein.

**B.    Granting the Debtors Authority to Enter into a Lead Agreement is Appropriate**

28.    In connection with the sale, the Debtors are seeking authorization to pay the Bid Protections (if necessary) to the Lead Purchaser in accordance with the Lead Agreement.

29.    Approval of bid protections like the Break-Up Fee and Expense Reimbursement in connection with sales pursuant to section 363 of the Bankruptcy Code has become an established practice in chapter 11 cases. Although bidding incentives are measured

against a business judgment standard in non-bankruptcy transactions, the administrative expense

provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. *See*

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527,

533 (3d Cir. 1999). Accordingly, bidding incentives must provide some postpetition benefit to a

debtor's estate to be approved. *Id.*

        30.    The Third Circuit has recognized the benefits and potential necessity of

bidding protections. First, such protections may be necessary to preserve the value of the estate

if they "promote[] more competitive bidding, such as by inducing a bid that otherwise would not

have been made and without which bidding would have been limited." *In re O'Brien*, 181 F.3d

at 537. Second, if a bid protection induces a bidder to research the value of the debtor and

convert the value to a dollar figure on which other bidders can rely, the bidder may have

provided a benefit to the estate by increasing the likelihood that the price at which the debtor is

sold will reflect its true worth. *In re Reliant Energy*, 594 F.3d 200, 206-07 (3d Cir. 2010).

        31.    In *In re O'Brien*, the court reviewed nine factors set forth by the lower

court as relevant in deciding whether to award a breakup fee:

    i.     the presence of self-dealing or manipulation in negotiating the breakup fee;

    ii.    whether the fee harms, rather than encourages, bidding;

    iii.   the reasonableness of the breakup fee relative to the purchase price;

    iv.   whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;

    v.    the ability of the request for a breakup fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

    vi.   the correlation of the fee to a maximum of value of the debtor's estate;

vii.    the support of the principal secured creditors and creditors' committees of the breakup fee;

viii.    the benefits of the safeguards to the debtor's estate; and

ix.    the substantial adverse impact of the breakup fee on unsecured creditors, where such creditors oppose the breakup fee.

See *In re O'Brien*, 181 F.3d at 536.

32.     The Bid Protections provide the type of benefits to the Debtors' estates identified by the Third Circuit in *O'Brien* and do not implicate any of the negative factors discussed therein. The Bid Protections were negotiated in good faith and are fair and reasonable in amount, particularly in light of the due diligence the Lead Purchaser must perform on the value of the Assets, the time and expense the Lead Purchaser has invested in negotiating an agreement with the Debtors, and the lack of other offers for the Debtors' assets at the price offered by the Lead Purchaser. The Bid Protections also enable the Debtors to set an adequate floor for an Auction and ensure that any competing bid will be higher and otherwise better than the Lead Agreement. In this manner, providing the Bid Protections to the Lead Purchaser facilitates competition in the Bidding Process and assists the Debtors in maximizing the value of their estates. Accordingly, the Debtors request authorization to offer the Bid Protections to the Lead Purchaser pursuant to the terms of the Bidding Procedures Order. Finally, authorization to pay the Bid Protections will not diminish the value of the Debtors' estates, as the Debtors intend to consummate the transactions contemplated by the Lead Agreement unless they receive a higher and otherwise better bid.

C.    **The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Free and Clear Sale**

33.     In the interest of attracting the best offers, the Debtors request authorization to sell the Assets free and clear of any and all liens, claims, encumbrances, and

other interests in accordance with section 363(f) of the Bankruptcy Code, with any such liens,

claims, encumbrances, and other interests attaching to the proceeds of the sale of the Assets and

distributed as provided for in a further order of the Court.

      34.     Under section 363(f) of the Bankruptcy Code, a debtor may sell estate

property free and clear of liens, claims, encumbrances, and other interests if one of the following

conditions is satisfied:

> (i)      applicable nonbankruptcy law permits sale of such property free
> and clear of such interest;
>
> (ii)     such entity consents;
>
> (iii)    such interest is a lien and the price at which such property is to be
> sold is greater than the aggregate value of all liens on such
> property;
>
> (iv)    such interest is in bona fide dispute; or
>
> (v)     such entity could be compelled, in a legal or equitable proceeding,
> to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Because section 363(f) of the Bankruptcy Code is written in the disjunctive,

satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free

and clear" of liens, claims, encumbrances, and other interests.  *See, e.g., In re Dura Automotive*

*Sys., Inc.*, 2007 WL 7728109 n.32 (Bankr. D. Del. Aug. 15, 2007).

      35.     Furthermore, section 105(a) of the Bankruptcy Code grants the Court

broad discretionary powers, providing that "[t]he Court may issue any order, process or

judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11

U.S.C. § 105(a).  This equitable power may be utilized to effectuate the provisions of section

363(f).  *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325 (highlighting bankruptcy

courts' equitable authority to authorize sale of estate assets free and clear).

36.     The Debtors will present evidence at the Sale Hearing that the sale satisfies the requirements of section 363(f).  Accordingly, the Debtors request authorization to sell the Assets free and clear of all liens, claims, encumbrances, and other interests (including any claims premised on a theory of successor liability).

**D.      The Successful Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

37.     Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *Mark Bell Furniture Warehouse, Inc. v. D. M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse, Inc.)*, 992 F.2d 7, 8 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D. N.J. May 11, 2007); *In re Abbotts Dairies of Pa.*, 788 F.2d 143, 147 (3d Cir. 1986).

38.     The Lead Agreement has been negotiated at arm's-length by sophisticated parties, each represented by their own advisors, and any Modified Lead Agreement will be negotiated at arm's-length by sophisticated parties, each represented by their own advisors. Accordingly, the Debtors request that the Sale Order include a provision that any Successful Bidder is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.  The Debtors believe that providing any Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Assets and closing of the same will occur promptly.

**E.      Assumption, Assignment, and Sale of Executory Contracts and Unexpired Leases Should be Authorized**

39.     Under section 365(a) of the Bankruptcy Code, a debtor in possession may, subject to the court's approval, assume or reject any executory contract or unexpired lease of a debtor.  11 U.S.C. § 365(a).  The standard governing the Court's approval of a debtor's decision

to assume or reject an executory contract or unexpired lease is whether the debtor's business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assocs.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). In this context, the business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *In re Stable Mews Assocs.*, 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. 365(b)(1).

40.    Once an executory contract is assumed, the debtor may elect to assign such contract. *See In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist the trustee in realizing the full value of the debtor's assets).

41.    Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but

should be given a "practical, pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment."). Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

      42.     To facilitate and effectuate the sale, the Debtors request approval under section 365 of the Bankruptcy Code of the Debtors' assumption, assignment, and sale of the Executory Contracts and Unexpired Leases to the Successful Bidder.  The Debtors further request that the Sale Order provide that the Executory Contracts and Unexpired Leases be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder, notwithstanding any provisions in the Executory Contracts and Unexpired Leases, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (3) that prohibit such assignment.

      43.     The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent).  Any and all Successful Bidders are responsible

for providing evidence of adequate assurance of future performance to the extent required in connection with the assumption and assignment of any Executory Contracts and Unexpired Leases. Any objections to any Successful Bidder's proposed form of adequate assurance of future performance must be raised at the Sale Hearing and will be resolved at the Sale Hearing.

44.    The counterparties to the Executory Contracts and Unexpired Leases will have sufficient opportunity to file an objection to the proposed Cure Costs. To the extent no objection is filed with regard to particular Cure Costs, such Cure Costs shall be binding on the applicable contract or lease counterparty. The payment of the Cure Costs will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtors determine that a particular contract is not truly executory and does not need to be cured to transfer the Assets to the Successful Bidder.

45.    Cure Costs disputed by any counterparties, with respect to any Executory Contracts and Unexpired Leases to be assumed and assigned to the Successful Bidder at the Closing (as defined in the Bidding Procedures), will be resolved by the Court at the Sale Hearing.

46.    Accordingly, the Debtors request authority to assume, assign, and sell executory contracts and unexpired leases under section 365 of the Bankruptcy Code.

**F.    Relief from Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

47.    Under Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order. Fed. R. Bankr. P. 6004(h). The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

01:19370066.1

Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for fourteen days, unless the court orders otherwise.

48.      To preserve the value of the Debtors' estates and limit the costs of administering and preserving the Assets, it is critical that the Debtors close the sale of the Assets as soon as possible after all closing conditions have been met or waived.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

### Notice

49.      No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion shall be given to : (i) the Office of the United States Trustee for the District of Delaware; (ii) the Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the Debtors' thirty (30) largest unsecured creditors; (v) counsel to the Debtors' prepetition and postpetition lenders; (vi) counsel to the Stalking Horse Bidder; and (vii) any party that has filed a notice of appearance and request for service of papers as of the date hereof.  The Debtors respectfully submit that no further notice of this Motion is required.

### No Previous Request

50.      No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: October 10, 2016
      Wilmington, Delaware           YOUNG CONAWAY STARGATT & TAYLOR, LLP

                              */s/  Donald J. Bowman, Jr.*
                              Matthew B. Lunn (No. 4119)
                              Donald J. Bowman, Jr. (No. 4383)
                              Shane M. Reil (No. 6195)
                              Rodney Square
                              1000 North King Street
                              Wilmington, Delaware 19801
                              Telephone: (302) 571-6600
                              Facsimilie: (302) 571-1253

                                     -and-

                              WILLKIE FARR & GALLAGHER LLP
                              Paul V. Shalhoub (admitted *pro hac vice*)
                              Debra C. McElligott (admitted *pro hac vice*)
                              787 Seventh Avenue
                              New York, New York 10019
                              Telephone:  (212) 728-8000
                              Facsimile:  (212) 728-8111

                              Jennifer J. Hardy (admitted *pro hac vice*)
                              600 Travis Street, Suite 2310
                              Houston, Texas 77002
                              Telephone: (713) 510-1766
                              Facsimile: (713) 510-1799

                              *Proposed Co-Counsel to the Debtors and*
                              *Debtors in Possession*