## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------x
|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| IMX Acquisition Corp., et al., [1] | : | Case No. 16-12238 (___) |
|  | : |  |
| Debtors. | : | (Joint Administration Requested) |

---------------------------------------------------x

## DECLARATION OF ROGER DESCHENES IN
## SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Roger Deschenes, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1.      I am the Chief Financial Officer of Implant Sciences Corporation, IMX Acquisition Corp., C Acquisition Corp., and Accurel Systems International Corporation (together, "**Implant Sciences**" or the "**Debtors**"). I have acted as Chief Financial Officer since July 2010. From January 2009 to July 2010, I served as Vice President, Finance, after joining the company as Controller in 2008. As part of my employment in such capacities, I have become familiar with the history, day-to-day operations, books and records, and businesses and financial affairs of the Debtors.[2]

2.      Prior to joining Implant Sciences, I held several senior accounting and financial roles at other corporations. From May 2006 to December 2008, I was Vice President, Finance of Beacon Roofing Supply, Inc., a leading supplier of roofing material and related products in North America. From 1990 to 2006, I served in various capacities at Saucony, Inc., including Vice President, Controller, Chief Accounting Officer, and Assistant Treasurer.

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: IMX Acquisition Corp. (9838); Implant Sciences Corporation (7126); C Acquisition Corp. (8021); Accurel Systems International Corporation (3856). The Debtors' headquarters are located at 500 Research Drive, Unit 3, Wilmington, MA 01887.

[2]    The Company's corporate structure is set forth in the chart annexed hereto as Exhibit A.

3.      Concurrently with the filing of this declaration (the "**Declaration**") on the date hereof (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession while they pursue a sale of their businesses and assets to L-3 Communications Corporation (the "**Lead Bidder**") or such other bidder that submits the highest or otherwise best offer.  To enable the Debtors to operate effectively postpetition and to avoid any adverse effects these chapter 11 cases might otherwise have, the Debtors have requested various types of relief in "first day" motions and applications (collectively, the "**First Day Motions**") filed with this Court.  Through the First Day Motions, each of which is described in more detail below, Implant Sciences seeks to maintain its business operations without interruption and establish administrative procedures to facilitate a smooth transition into chapter 11.  I am familiar with the contents of each First Day Motion, and I believe that the relief sought in each First Day Motion is critical to the success of the Debtors' chapter 11 cases.

4.      I submit this Declaration to assist this Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information I have acquired from employees who report to me, consultation with other officers of the Debtors, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtors' operations, financial condition, and industry.  I am duly authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

5.      Part I of this Declaration provides an overview of the Debtors' businesses, organizational structure, and prepetition capital structure, as well as the circumstances that led to the commencement of these chapter 11 cases and the objectives the Debtors seek to accomplish.  Part II provides factual support for the relief sought in the First Day Motions.

6.      Unless otherwise indicated, the financial information contained herein is provided on a consolidated basis.

## I.      Description of the Debtors

### A.      The Debtors' Businesses

7.      Implant Sciences is a leader and innovator in the explosives trace detection ("**ETD**") market.  Its primary business is to design, manufacture, and sell systems and sensors that detect trace amounts of explosives and drugs.  The company's products are used in various security, safety, and defense industries, including the aviation, transportation, air cargo inspection, critical infrastructure protection, customs and border protection, force protection, public safety, and emergency response markets.  Implant Sciences has sold more than 5,000 explosive trace detection products in 70 countries to customers such as the United States Transportation Security Administration, the Canadian Air Transportation Security Authority, and several central airports in the European Union.

8.      Implant Sciences was founded in Bedford, Massachusetts in 1984. Originally, the company developed ion-based technologies and provided commercial services and products to the semiconductor, medical device, and security industries.  In 2007, the Debtors made the strategic decision to focus exclusively on their security products and divested their noncore semiconductor and medical businesses.

01:19365946.2

9.      In 2008, the Debtors acquired Ion Metrics, Inc. ("**Ion**"), a California-based company that manufactured mass sensor systems to detect and analyze explosives and other chemical compounds for the homeland defense, forensic, environmental, and security markets. Acquiring Ion expanded the universe of technology available for use in Implant Sciences' products and also increased the company's efficiency and cost effectiveness.  In particular, the Debtors acquired Ion's quadrupole mass spectrometry ("**QMS**") detector technology, which detects chemical compounds with a high degree of reliability at a comparatively low manufacturing cost.

10.      Among the Debtors' key products is the "Quantum Sniffer" QS-B220, a desktop device that detects trace amounts of a wide variety of military, commercial, and homemade explosives, as well as an array of illicit drugs, in seconds.  The QS-B220 has been a success in the ETD market:  on June 9, 2016, the Debtors announced that the model had been deployed to over 160 airports in the United States and Europe over the past twelve months, with further deliveries in progress.  The Debtors have also enjoyed the success of the "Quantum Sniffer" QS-H150, a handheld device that detects trace amounts of the same assortment of explosives detected by the QS-B220.  The QS-H150 has been purchased by major airports, international banks, and United States government agencies.  Both products incorporate Implant Sciences' patented inCal technology, a fully automatic internal calibration system that monitors the environment, senses changes that affect the system's accuracy, and re-calibrates accordingly.

11.      Presently, Implant Sciences works both independently and in conjunction with government agencies to develop innovative solutions in the ETD sphere and to identify new applications for its proprietary technology.  Products under development include a next-generation handheld detector that will detect drugs as well as explosives, a miniature mass

01:19365946.2

- 4 -

spectrometer utilizing QMS technology, and "hyphenated" detectors, which use multiple sensors to determine the presence of a threat in settings where several chemicals are present.

**B.      Facilities and Employees**

12.      Implant Sciences is headquartered in Wilmington, Massachusetts, where it also maintains a manufacturing and production facility.

13.      As of the Petition Date, Implant Sciences employs approximately 108 full-time employees and 2 part-time employees, all of whom work in the Massachusetts office. Approximately 55 of the Debtors' employees are salaried and 55 are paid on an hourly basis.  In addition to their full time workforce, the Debtors also employ approximately 20 temporary employees to fill critical and immediate business needs.  Finally, the Debtors currently employ three independent consultants, who provide services and advice relating to, among other things, sales and marketing, finance, security and intelligence, and public relations.

**C.      The Debtors' Corporate Structure**

14.      As illustrated by the organizational structure chart attached hereto as Exhibit A, Implant Sciences Corporation (the "**Parent**") is a Massachusetts corporation and the direct parent of C Acquisition Corp., a Delaware corporation, IMX Acquisition Corp. ("**IMX**"), a Delaware corporation, and Accurel Systems International Corporation, a California corporation. The Debtors do not have any non-Debtor affiliates.

**D.      The Debtors' Prepetition Capital Structure**

15.      As of the Petition Date, the Debtors owed approximately $84.1 million of consolidated secured indebtedness to third parties.  These obligations consist of (i) approximately $38.4 million in aggregate principal and interest amounts outstanding under Term Notes issued pursuant to the Debtors' 2008 Note and Warrant Purchase Agreement (as defined herein), (ii) approximately $23.2 million in aggregate principal and interest amounts

outstanding under Term Notes issued pursuant to the Debtors' 2014 Note Purchase Agreement (as defined herein), and (iii) approximately $22.5 million in aggregate principal and interest amounts outstanding under the Revolving Note issued pursuant to the Debtors' Credit Agreement (as defined herein).

16.    Each of the Term Notes and the Revolving Note are secured by a lien on substantially all of the Debtors' assets, subject to the priority scheme memorialized in that certain intercreditor agreement dated as of March 19, 2014 (the "**Intercreditor Agreement**"), by and between BAM Administrative Services LLC ("**BAM**") and DMRJ Group LLC ("**DMRJ**"). The Intercreditor Agreement is described further herein. The Term Notes and the Revolving Note have been amended a number of times to address, among other things, looming maturities and impending covenant defaults.

(ii)    *The Term Notes Issued Under 2008 Note and Warrant Purchase Agreement*

17.    On December 10, 2008, the Parent entered into that certain note and warrant purchase agreement (as amended from time to time, the "**2008 Note and Warrant Purchase Agreement**") with DMRJ, an accredited institutional investor managed by Platinum Partners Value Arbitrage Fund L.P. ("**Platinum**").

18.    The Parent has issued four senior secured promissory notes: the 2008 Note, the 2009 Note, the 2012 Note, and the 2013 Note (each as defined herein, and together with the 2014 Notes, the "**Term Notes**") pursuant to the 2008 Note and Warrant Purchase Agreement, for a total of $38.4 million in aggregate principal and interest amounts currently outstanding. The 2012 Note and 2013 Note were created by the cancellation of an aggregate of $24,000,000 of principal of the outstanding indebtedness under that certain Credit Agreement among DMRJ, as Lender, the Parent, as Borrower, and the remaining Debtors, as Guarantors,

dated as of September 4, 2009 (the "**Credit Agreement**").    Each of the other Debtors is a

guarantor under the Term Notes.

(a)    The 2008 Note.

19.    Pursuant to the 2008 Note and Warrant Purchase Agreement, the Parent

issued a 15% senior secured convertible promissory note in the amount of $5.6 million (the

"**2008 Note**"), along with a warrant to purchase one million shares of the Parent's common

stock, to DMRJ.  The 2008 Note is convertible into common stock pursuant to a conversion

formula established under the 2008 Note and Warrant Purchase Agreement.  Proceeds from the

2008 Note were used to retire existing debt obligations.

20.    On May 4, 2015, the Parent entered into an assignment agreement (the

"**Assignment Agreement**") with DMRJ and Montsant Partners, LLC ("**Montsant**"), another

fund managed by Platinum.  Pursuant to the Assignment Agreement, DMRJ assigned its rights,

title, and interest in the 2008 Note to Montsant.  Montsant accepted assignment of the 2008 Note

at the request of DMRJ.

21.    On July 20, 2016, the Parent entered into that certain Omnibus Fifteenth

Amendment to Credit Agreement and Seventeenth Amendment to Note and Warrant Purchase

Agreement, effective as of June 30, 2016, with DMRJ and Montsant (the "**June 2016**

**Amendment**"), which, among other things, changed the maturity date of the 2008 Note from

December 30, 2016 to October 31, 2016.

22.    As of the Petition Date, there is $5,283,754.56 in principal amount and

$202,543.52 of accrued and unpaid interest outstanding under the 2008 Note.

(b)    The 2009 Note.

23.    On July 1, 2009, the Parent and DMRJ entered into that certain First

Amendment to Note and Warrant Purchase Agreement, pursuant to which the Parent issued a

15% senior secured promissory note to DMRJ in the aggregate principal amount of $1 million (the "**2009 Note**"). As of the Petition Date, $1 million in aggregate principal amount and $1,187,999.46 in accrued interest remains outstanding under the 2009 Note. The June 2016 Amendment extended the maturity date of the 2009 Note from June 30, 2016 to October 31, 2016.

(c)     The 2012 Note.

24.     Pursuant to that certain Omnibus Ninth Amendment to Credit Agreement and Eleventh Amendment to Note and Warrant Purchase Agreement, dated as of September 5, 2012 (the "**Ninth Omnibus Amendment**"), the Parent issued a second 15% senior secured convertible promissory note (the "**2012 Note**") to DMRJ in the aggregate principal amount of $12 million. As of the Petition Date, $ 11,970,000.00 in aggregate principal amount and $592,648.46 in accrued interest remains outstanding under the 2012 Note. The June 2016 Amendment changed the maturity date of the 2012 Note from December 30, 2016 to October 31, 2016.

(d)     The 2013 Note.

25.     Pursuant to that certain Omnibus Tenth Amendment to Credit Agreement and Twelfth Amendment to Note and Warrant Purchase Agreement, dated as of February 28, 2013, the Parent issued a third 15% senior secured convertible promissory note (the "**2013 Note**") to DMRJ in the aggregate principal amount of $12 million. As of the Petition Date, $17,523,455.00 in aggregate principal amount and $671,732.48 in accrued interest remains outstanding under the 2013 Note. The June 2016 Amendment changed the maturity date of the 2013 Note from December 30, 2016 to October 31, 2016.

(iii)    *The 2014 Notes.*

26.    On March 19, 2014, Parent entered into that certain note purchase agreement (the "**2014 Note Purchase Agreement**") with the investors party thereto (the "**Investors**") and BAM, as administrative agent (the "**Prepetition Administrative Agent**"). Pursuant to the 2014 Note Purchase Agreement, the Investors purchased 16% senior secured promissory notes (the "**2014 Notes**") from Parent in an aggregate principal amount of $20 million.  On the same date, pursuant to the Intercreditor Agreement, DMRJ and Montsant consented to the subordination of their liens to the Prepetition Administrative Agent's liens.

27.    The Debtors used the proceeds from the sale of the notes under the 2014 Note Purchase Agreement to repay (i) approximately $17.6 million of the aggregate principal amount outstanding under the Revolving Note (as defined below), (ii) approximately $1.8 million of interest outstanding under the Revolving Note, and (iii) $567,000 of interest outstanding under the 2012 Note.

28.    As of the Petition Date, $20,000,000.00 in aggregate principal amount and $3,200,000 in accrued interest remains outstanding under the 2014 Notes.  On April 6, 2016, the Debtors entered into that certain Consent and Second Omnibus Amendment to Secured Term Notes (the "**Consent Amendment**") with BAM, pursuant to which, among other things, the maturity date of the 2014 Notes was extended to June 29, 2016.  On July 20, 2016, the maturity date of the 2014 Notes automatically extended to October 30, 2016 pursuant to the terms of the Consent Amendment.

(iv)    *The Revolving Note*

29.    Under the Credit Agreement, the Parent executed and delivered a revolving promissory note (the "**Revolving Note**") to DMRJ in the aggregate principal amount

- 9 -

of $3,000,000. Through a series of amendments over the course of the next two years, culminating in that certain Amended and Restated Promissory Note, dated as of September 29, 2011, issued by the Parent to DMRJ, the limit on the Revolving Note increased to $23,000,000. The Revolving Note accrues interest at a rate of 15%. As of the Petition Date, there is $17,662,137.93 in aggregate principal amount and $4,830,538.91 in accrued interest outstanding under the Revolving Note. The June 2016 Amendment extended the maturity date of the Revolving Note from June 30, 2016 to October 31, 2016.

   30. Annexed hereto as <u>Exhibit B</u> is a schedule setting forth the outstanding amounts of the above indebtedness in summary fashion.

  (v) *Equity Ownership*

   31. On June 24, 1999, the Parent made an initial public offering of one million units (each unit consisting of one share of common stock and one redeemable common stock purchase warrant), which raised approximately $7.5 million dollars. The company's common stock was delisted by the New York Stock Exchange in June 2009 as a result of its failure to comply with certain continued listing requirements. Implant Sciences has been trading on the over-the-counter markets under the trading symbol "IMSC" since May 2009, which has limited the Debtors' liquidity and impaired their ability to raise capital.

**E. Events Leading to Chapter 11 Cases**

   32. Facing impending maturities under their funded indebtedness, beginning in August of 2015, the Debtors, in consultation with their legal and financial advisors, explored several potential transactions through which to sell all or substantial parts of their business. The Debtors reached out to over 63 potential acquiring parties, distributing confidential information memorandums to fourteen parties who expressed an interest in acquiring all or a portion of the Debtors' assets. As a result of the marketing process, the Debtors received three indications of

interest, two of which the Debtors' advisors determined fairly reflected the Company's valuation and should be advanced to the next stage of the marketing process.

33.    In the next stage of the process, only the Lead Bidder engaged in further discussions at a valuation level which was deemed reasonable and fair by the Debtors and their advisors.  Although the Debtors and their advisors continued discussions with other parties expressing interest, those parties' proposed terms and conditions proved uncompelling in light of the Lead Bidder's offer.

## F.    Objectives of the Chapter 11 Cases

34.    The Debtors — facing impending maturities and tightening liquidity in addition to this requirement—determined to commence these chapter 11 cases.

35.    The Debtors have now entered into a stalking horse asset purchase agreement (the "Lead Agreement") with the Lead Bidder.  The Lead Agreement includes a cash sale price of $117.5 million (subject to a working capital adjustment), plus assumption of certain liabilities, for substantially all of the assets of the Debtors.  The Lead Agreement preserves the Debtors' business as a going concern and provides that substantially all of the Debtors' employees will have the ability to keep their jobs on substantially the same terms and conditions under which they are currently employed.  The Lead Agreement is not conditioned on financing or the completion of due diligence.  Through the sale motion filed concurrently herewith, the Debtors are seeking, among other things, approval of bid protections relating to the Lead Bidder, as well as bidding procedures to ensure that the Debtors receive the highest and best value for their assets through a competitive auction process (the "Auction").

## II.    Summary of First Day Motions[3]

36.    I believe the First Day Motions, each of which is described below, are

necessary to enable the Debtors to operate effectively and with minimum disruption in chapter

11 and to maximize the value of their assets.  The Debtors have filed the First Day Motions

contemporaneously with their chapter 11 petitions.

37.    In connection with the preparation for these chapter 11 cases, I

participated in preparing and/or reviewed each of the First Day Motions referenced below,

including the exhibits thereto.  I believe the information contained in the First Day Motions is

accurate and correct.  As set forth more fully below, I believe that the entry of orders granting the

relief requested in these motions and applications is (i) critical to the Debtors' ability to preserve

and maximize the value of their estates, (ii) necessary to provide the Debtors with a reasonable

opportunity to successfully market and sell all of their assets, and (iii) in the best interests of the

Debtors' creditors and other parties in interest.

A.    **Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion")**

38.    Through the Joint Administration Motion, the Debtors seek an order

directing the joint administration of their chapter 11 cases for procedural purposes only pursuant

to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  The

Debtors request that the court maintain one file and docket for the chapter 11 cases under the

lead case, IMX Acquisition Corp.  Jointly administering the Debtors' chapter 11 cases will save

significant time and money by avoiding duplicative hearings, notices, applications, orders, and

objections, and will allow all parties in interest to easily monitor the chapter 11 cases.

---

[3]    Capitalized terms used but not defined in this section have the meanings given them in the relevant First Day Motion.

Furthermore, joint administration will not prejudice any party in interest, as the relief sought in the Joint Administration Motion is solely procedural and each creditor will retain the ability to file its claim against a particular estate.

**B.      Applications and Motions Related to the Retention of Professionals.**

(i)      **Debtors' Application for Entry of an Order, Pursuant to 28 U.S.C. § 156(c), Approving the Retention and Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtors, Effective as of the Petition Date (the "Claims and Noticing Agent Motion")**

39.      Concurrently herewith, the Debtors filed an application to retain Kurtzman Carson Consultants ("**KCC**") as this Court's notice and claims agent for the Debtors' chapter 11 cases. I believe that the retention of KCC will benefit the Debtors' estates, their creditors, and other parties in interest, as I understand that KCC is a data processing firm with extensive experience in noticing, claims processing and other administrative tasks in chapter 11 cases. Additionally, the Debtors solicited bids from five prominent bankruptcy claims and noticing agents prior to selecting KCC and believe KCC rates are reasonable given the quality of KCC services and prior bankruptcy experience. Given the need for the services described above and KCC expertise in providing such services, I believe that retaining KCC will expedite service of notices, streamline the claims administration process, and permit the Debtors to focus on their reorganization efforts. I also understand, as reflected in the Gershbein Declaration, that KCC holds no interest adverse to the Debtors or their estates and, other than the services currently being provided for the Debtors, has no connection with the Debtors, their creditors, or any party in interest in this case.

40.      The Debtors also intend to file a separate application to retain KCC as an administrative agent to provide, among other things, certain solicitation and balloting services.

    (ii)    *Other Retention Applications.*

    41.    The Debtors also intend to file certain applications, upon the scheduling of a further hearing by the Court, to retain professionals who will assist the Debtors in the administration of these chapter 11 cases. Among certain other professionals, the Debtors will seek to retain: Willkie Farr & Gallagher LLP and Young Conaway Stargatt and Taylor, LLP as co-bankruptcy counsel with regard to the filing and prosecution of these chapter 11 cases, Chardan Capital Markets, LLC and Noble Financial Capital Markets as investment bankers and financial advisors, and Ellenoff, Grossman & Schole LLP as counsel with respect to the negotiation of the DIP Credit Agreement.

    42.    In addition, the Debtors intend to file a motion authorizing the Debtors to retain certain professionals utilized in the ordinary course of their businesses without the submission of separate retention applications and the issuance of separate orders approving the retention of each individual professional and authorizing the Debtors to pay each professional in accordance with the terms set forth in the motion without application to the Court by such professional.

**C.**    **Debtors' Motion for an Order, Pursuant to Sections 105(a), 345, 363, and 503(b) of the Bankruptcy Code, Bankruptcy Rule 2015 and Local Rule 2015-2, (A) Authorizing and Approving (I) Continued Use of Cash Management System and (II) Use of Prepetition Bank Accounts and Business Forms, (B) Authorizing the Bank Participating in the Cash Management System to Honor Certain Transfers and Charge Certain Amounts, (C) Waiving the Requirements of Section 345(b) on an Interim Basis, (D) Granting Administrative Expense Status to Postpetition Intercompany Claims, and (E) Granting Related Relief (the "Cash Management Motion")**

    43.    In the ordinary course of their businesses prior to the Petition Date, and as is typical with business organizations of similar size and scope, the Debtors maintain a centralized cash management system (the "**Cash Management System**") to collect, transfer, and disburse funds generated through their operations efficiently and to record such transactions

01:19365946.2

accurately.  Through the Cash Management Motion, the Debtors seek, among other things, to maintain their existing Cash Management System.

44.    I believe that the Debtors' existing Cash Management System and intercompany accounting procedures are essential to the orderly operation of the Debtors' businesses.  Creating a new Cash Management System could cause confusion, disrupt payroll, introduce inefficiency into the Debtors' operations when efficiency is most essential, and strain the Debtors' relationships with critical third parties, each of which could diminish the prospects for a successful sale of the Debtors' assets.

45.    I understand that the U.S. Trustee Guidelines require chapter 11 debtors to, among other things, close all existing bank accounts and open new accounts which must be designated debtor-in-possession bank accounts and obtain, establish and maintain separate debtor-in-possession accounts.  The Debtors intend to request a waiver of such requirements, as the disruption that would be caused by closing all existing accounts and replacing them with new accounts would inefficiently utilize their resources and thus inhibit their efforts to preserve the value of their estates.  In addition, I understand that section 345(b) of the Bankruptcy Code contains certain deposit, investment and reporting requirements.  The Debtors believe cause exists for allowing them to maintain their established cash management system without meeting these requirements, as their accounts are with a financially stable banking institution and are FDIC insured.  Additionally, it would be burdensome and impractical for the Debtors to utilize their limited financial personnel to open multiple operating accounts to strictly comply with this section of the Bankruptcy Code.

46.    Moreover, the Debtors request authority to continue performing, in their discretion, their prepetition practices with respect to intercompany transactions and to grant

01:19365946.2

administrative expense status to obligations arising out of intercompany claims.  If their system

of intercompany transfers were to be discontinued, the Debtors' operations could be

unnecessarily disrupted.

      47.     For the foregoing reasons, allowing the Debtors to maintain the Cash

Management System is in the best interests of their estates, creditors, and other parties in interest.

Thus, the Debtors seek authorization to continue the management of their cash receipts and

disbursements in the manner in which they were handled immediately prior to the Petition Date

and to continue intercompany transfers in the ordinary course of business.

**D.    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Payment of Certain Prepetition Workforce Claims, Including Wages, Salaries and Other Compensation, (B) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (C) Authorizing Payment of Reimbursement to Employees for Expenses Incurred Prepetition, (D) Authorizing Payment of Withholding and Payroll-Related Taxes, (E) Authorizing Payment of Workers' Compensation Obligations, and (F) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers (the "Wages Motion")**

      48.     The Debtors have filed a motion seeking authority to, among other things,

satisfy certain of their prepetition obligations to their Employees and Consultants, pay

prepetition payroll-related taxes and withholdings associated with the Debtors' employee wage

claims and benefit obligations, continue any employee benefit programs in place as of the

Petition Date (including satisfying any prepetition obligations associated with such programs)

and reimburse Employees for prepetition travel and other business expenses that were incurred

on behalf of the Debtors.  This relief is critical to the Debtors' businesses and reorganization

efforts.

      49.     For the purposes of the Wages Motion, the term **"Employees"** includes all

persons with a right to compensation, benefits, reimbursement, or similar payments in

connection with employment by the Debtors prior to the Petition Date.  The term "**Consultants**" includes all third-party contractors that perform services necessary for the operation of the Debtors' businesses.  As of the Petition Date, the Debtors employ approximately 110 Employees and 3 Consultants, to whom they owe approximately $0 in unpaid compensation.  The Debtors also owe $0 on account of employee benefit programs and $40,000 on account of reimbursable business expenses.

50.     In order to achieve a successful sale of their businesses through these chapter 11 cases, the Debtors must be permitted to satisfy their obligations to the Employees and the Consultants.  The relief requested will allow the Debtors to retain personnel with the proprietary knowledge necessary to operate the Debtors' businesses, as well as the highly specialized knowledge required to compete in the ETD industry generally.  If the relief requested under the Wages Motion is not granted, I believe that the morale and loyalty of the Employees would be significantly endangered.  If these Employees and Consultants seek alternative opportunities at this critical time, I believe the Debtors may find themselves unable to continue as a going concern and, consequently, incapable of consummating a sale of their businesses that maximizes value for all of their creditors and other parties in interest.

51.     The total amount to be paid if the relief sought in the motion is granted is modest compared with the size of the Debtors' estates and the integral role of the Employees and the Consultants in ensuring a successful sale of the Debtors' assets.  Employee Obligations paid pursuant to the interim order will not exceed $180,000 total or $12,850 for any individual employee, and no bonuses will be paid to employees within the first twenty-one (21) days following the Petition Date.  I believe authorizing the Debtors to pay these obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors,

their estates, their creditors and other parties in interest, and will enable the Debtors to continue

to operate their businesses without disruption in an economic and efficient manner.

**E.**     **Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Thereto (the "Utilities Motion")**

52.     In connection with the operation of their businesses and management of

their properties, the Debtors obtain electricity, natural gas, water, telecommunications, waste

disposal and other similar utility products and services (collectively, the "**Utility Services**") from

various utility companies (collectively, the "**Utility Companies**"). The Debtors seek entry of

interim and final orders prohibiting the Utility Companies from altering or discontinuing the

Utility Services and deeming the Utility Companies adequately assured of future performance by

virtue of the Debtors' proposed adequate assurance.

53.     To provide adequate assurance of payment for future services to the

Utility Companies, the Debtors propose to provide a deposit equal to fifty percent (50%) of the

Debtors' estimated monthly cost of the Utility Services into a segregated account maintained by

the Debtors (the "**Adequate Assurance Deposit**"). I believe that the Debtors' Adequate

Assurance Deposit constitutes sufficient adequate assurance to the Utility Companies. However,

in light of the severe consequences to the Debtors of any interruption in services by the Utility

Companies and the recognition that Utility Companies have the right to evaluate the proposed

adequate assurance on a case-by-case basis, if any Utility Company believes additional assurance

is needed, the Debtors have proposed procedures for the Utility Companies to request additional

adequate assurance. I believe these procedures, as outlined in the Utilities Motion, are not only

fair and reasonable, but also necessary for the Debtors' stability. Furthermore, the Debtors fully

intend to timely comply with their postpetition obligations to the Utility Companies.

54.    I believe that without the relief requested in the Utilities Motion, the

Debtors could be harmed by having to address numerous requests by Utility Companies in a

disorganized manner at a critical period in their efforts to sell their businesses.

**F.    Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363 and 364 of the Bankruptcy Code, (I) Authorizing (A) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Programs, Including Payment of Policy Premiums, and (B) Continuation of Insurance Premium Financing Programs; and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto (the "Insurance Motion")**

55.    In the ordinary course of their businesses, the Debtors maintain various

general liability, property, and other types of insurance policies and programs (the "**Insurance**

**Programs**"). Through the Insurance Motion, the Debtors seek entry of interim and final orders

authorizing them to continue, renew, or enter into the Insurance Programs and pay any

undisputed prepetition obligations and postpetition obligations (on an ongoing basis) thereunder.

56.    From time to time, in the ordinary course of their business, the Debtors

finance the premiums on certain of the Insurance Programs pursuant to a prepetition insurance

premium finance agreement (the "**PFA**") by and between Implant Sciences Corporation and

AFCO Insurance Premium Finance ("**AFCO**"). The Debtors are seeking authority to continue

honoring their obligations under the PFA, as AFCO may be permitted to terminate the PFA if the

Debtors are unable to make payments thereunder. The Debtors would then be required to obtain

replacement insurance on an expedited basis and likely at a significantly increased cost. Even if

AFCO is not permitted to terminate the PFA, any interruption of payments would severely and

adversely affect the Debtors' ability to finance premiums for future policies.

57.    In light of the importance of maintaining insurance coverage with respect to their business activities and preserving liquidity by financing certain of their insurance premiums, I believe that the authority to continue their Insurance Programs, honor the PFA, in accordance with the Debtors' prepetition business practices is in the best interest of the Debtors and their estates.

**G.    Debtors' Motion for Entry of an Order Authorizing Payment of Certain Prepetition Shipping, Delivery, and Customs Charges (the "Common Carriers Motion")**

58.    In the ordinary course of operations, the Debtors' supply and delivery system depends upon the use of common carriers, including shippers, freight forwarders, consolidators, customs brokers, and other common carriers (the **"Common Carriers"**) who process and ship the Debtors' merchandise to their customers.  As a result, the Common Carriers regularly possess, among other things, certain of the Debtors' materials and equipment in the ordinary course of the Debtors' operations.  It is essential for the Debtors' continuing business viability and the success of their restructuring efforts that they maintain the reliable and efficient delivery of, and access to, materials and equipment.  Therefore, the Debtors respectfully request authority to pay, in their discretion, prepetition claims for the Common Carriers (together, the **"Transporter Claims"**) owing as of the Petition Date.

59.    As of the Petition Date, the Debtors estimate, based on a thorough review of their books and records, that the Transporter Claims total approximately $85,000.  If entered, the order will grant the Debtors the authority to pay the Transporter Claims in full.  I believe that this relief is essential to maximizing the Debtors' value and in the best interests of the Debtors and their estates.

**H.    Debtors' Motion for Entry of Order, Pursuant to Sections 105(a), 363(b), 507(a)(8), 541, 1107(a) and 1108 of the Bankruptcy Code Authorizing (I) the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations and**

**(II) Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto (the "Taxes Motion")**

60.    The Debtors seek entry of an order authorizing them to pay various

prepetition sales, franchise, and other taxes (collectively, the "**Taxes**") to various federal, state,

local, and foreign authorities (collectively, the "**Taxing Authorities**") and to certain federal,

state, local, and foreign government agencies (collectively, the "**Regulatory Authorities**" and

together with the Taxing Authorities, the "**Applicable Authorities**") on a periodic basis, in

each case, as and when such obligations become due.

61.    The Debtors' failure to pay the Taxes may cause the Applicable

Authorities to take precipitous action, including, but not limited to, seeking to lift the automatic

stay and imposing personal liability on the Debtors' officers and directors, which would disrupt

the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors'

estates.  Failure to pay the prepetition Taxes could also have a negative impact on the Debtors'

existing permits and licenses.  In addition, the Debtors believe that most of the prepetition Taxes

are entitled to priority.  Thus, permitting the Debtors to pay prepetition Taxes would affect only

the timing of the payments, not the amount of the ultimate recovery.  As of the Petition Date, the

Debtors estimate, based on a thorough review of their books and records, that the Taxes total

approximately $175,000.

62.    The order, if entered, will grant the Debtors the authority to pay the Taxes

in accordance with the Debtors' prepetition practices.  I believe that payment of the prepetition

Taxes is critical to the Debtors' continued, uninterrupted operations and is in the best interests of

their estates.

I.    **Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363(c), 503(b)(1), 1107(a), and 1108 of the Bankruptcy Code, Authorizing (I) the Debtors to Honor Prepetition Obligations Related to Customer Programs and Otherwise Continue Customer Programs in the Ordinary Course of Business and (II) Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto (the "Customer Programs Motion")**

63.    In the ordinary course of their businesses, the Debtors seek to develop and sustain a positive reputation in the marketplace through the implementation of certain customer programs (the "**Customer Programs**"). The Debtors' Customer Programs include a warranty and maintenance program, pursuant to which they provide their customers with a one- to two-year warranty program on equipment sold, as well as offering customers extended warranties and repair services. The Debtors also, in the ordinary course of their business, require advance deposits or prepayments from buyers located overseas.

64.    Through the Customer Programs Motion, the Debtors seek authorization to continue their Customer Programs in the ordinary course of business and to pay amounts due and owing to their warranty service providers on account of prepetition services provided to the Debtors. The termination of the Customer Programs would undoubtedly have an adverse effect on the Debtors' businesses and their ability to reorganize, as the Debtors' success and the viability of their businesses depends on the loyalty of their customers. Therefore, I believe that the continuation of the Customer Programs is necessary to preserve the Debtors' critical customer relationships and is in the best interests of the Debtors and their estates.

65.    As of the Petition Date, the Debtors estimate, based on a thorough review of their books and records, that the aggregate amount owed on account of Customer Programs totals approximately $450,000. The Debtors seek entry of an interim order that will grant the Debtors the authority to pay only a portion of those claims within the twenty-one (21) day period following the Petition Date, up to a maximum amount of $375,000.

01:19365946.2

J.      **Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363, 1107(a) and 1008 of the Bankruptcy Code, (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors, (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Granting Certain Related Relief (the "Critical Vendors Motion")**

66.     In order to continue operating their businesses, the Debtors must rely on certain vendors and suppliers (the "**Critical Vendors**") that provide the Debtors with particular goods and services that are critical to the Debtors' operations and financial viability.  Absent the cooperation of these Critical Vendors, the Debtors may be unable to continue their operations without materially inflated costs or substantial interruptions.  I believe that the relief sought in the Critical Vendors Motion is necessary for a successful reorganization and is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

67.     In connection with determining which vendors are actually essential to the Debtors' business operations, the Debtors considered, among other things, which vendors: (a) are absolutely needed to continue to operate without disruption; (b) would be prohibitively expensive or difficult to replace under the circumstances; and (c) would present an unacceptable risk to the Debtors' business should they threaten to discontinue providing goods or services postpetition.  The Debtors also considered the financial condition of the vendors and service providers to the extent such information was known, including each vendor's or supplier's level of dependence on the Debtors' continued business and whether such vendor or supplier is itself financially distressed.

68.     Based on the foregoing considerations, the Debtors identified Critical Vendors whose cessation of services or provision of goods would quickly have a negative impact on the Debtors' businesses and result in irreparable harm to the Debtors' estates.  The Debtors believe that if the Critical Vendors refuse to supply services and/or goods to the Debtors

postpetition, then the immediate replacement of the Critical Vendors would be impracticable or, in some cases, impossible.  Without authority to pay the Critical Vendors, the Debtors could be forced to suspend operations immediately, which would be highly destructive to the Debtors' efforts to maximize the value of their assets.  Accordingly, the Debtors seek authorization to pay the Critical Vendors in the ordinary course of business.

69.     As of the Petition Date, the Debtors estimate, based on a thorough review of their books and records, that the aggregate amount owed to Critical Vendors totals approximately $3.4 million.  The Debtors seek entry of an interim order that will grant the Debtors the authority to pay only a portion of the claims of Critical Vendors within the twenty-one (21) day period following the Petition Date, up to a maximum amount of $2.8 million.  I believe that the limited relief requested on an interim basis is the minimum amount necessary to avoid the immediate and irreparable harm that would befall the Debtors' estates if the Debtors were unable to pay any Critical Vendors prior to the final hearing on this motion.  While the Debtors are seeking limited relief on an interim basis, I submit that the full relief requested on a final basis is critical to maximizing the value of the Debtors' estates beyond the initial interim period.

**K.    Debtors' Motion for Interim Order and Final Order Pursuant to Bankruptcy Code Sections 105(a), 362(a)(3) and 541 and Bankruptcy Rule 3001 Establishing Notice and Hearing Procedures for Trading in Equity Securities in Debtors (the "NOL Motion")**

70.     Through the NOL Motion, the Debtors seek to establish procedures to protect the value of their net operating loss carryforwards ("**NOLs**"), including notice and objection procedures regarding certain transfers of equity interests in the Parent.  The procedures proposed in the NOL Motion would apply to the common and preferred stock of the Parent

(including any interests to acquire such stock), as well as claims (as such term is defined in section 101(5) of the Bankruptcy Code) against the Debtors.

71.    As of the Petition Date, the Debtors estimate that they have incurred at least $116,000,000 of consolidated NOLs for U.S. federal income tax purposes.  The Debtors seek to maintain the value of these NOLs and any other tax attributes, as the Internal Revenue Code of 1986, as amended (the "**Tax Code**") generally permits corporations to carry over such losses and tax credits to offset future income and reduce future tax liability. *See* 26 U.S.C. §§ 172 and 904(c).

72.    Sections 382 and 383 of the Tax Code limits a corporation's ability to use its NOLs to reduce future tax liabilities after the occurrence of an "ownership change."  Pursuant to Section 382, an ownership change occurs if, immediately after any owner shift involving a "5-percent shareholder" or any equity structure shift, (a) the percentage of the stock of the loss corporation owned by one or more 5-percent shareholders has increased by more than fifty percentage points, or (b) the lowest percentage of stock of the loss corporation (or any predecessor corporation) owned by such shareholders at any time during the relevant testing period (under subsection (i), generally three years).

73.    The Debtors will not be able to use their NOLs to reduce future tax liability if such an ownership change occurs before the effective date of a plan of reorganization.  Accordingly, the Debtors seek approval of the procedures proposed in the NOL Motion so that they may monitor any changes in the ownership of (i) the Parent's stock and (ii) claims against any of the Debtors and protect against any trades that may constitute ownership changes for the purposes of section 382 of the Tax Code.  Granting the relief requested is in the best interests of

the Debtors, their estates, and all parties in interests, as the savings presented by the NOLs are valuable assets of the Debtors' estates that could meaningfully increase the Debtors' cash.

L.    **Debtors' Motion for Entry and Approval of Interim and Final Orders: (A) Authorizing and Approving Debtors' Postpetition Financing; (B) Granting Liens and Security Interests and Providing Super-Priority Administrative Expense Status; (C) Authorizing Use of Cash Collateral and Affording Adequate Protection; (D) Modifying Automatic Stay; and (E) Scheduling Final Hearing, Pursuant to 11 U.S.C. §§ 105, 362, 363 and 365 and Federal Rules of Bankruptcy Procedure 2002 and 4001(c) and (d) (the "DIP Motion")**

74.    To fund the Debtors' operations through the remainder of the marketing process and the culmination of the Auction and approval of the sale to the successful bidder at the Auction, DIP SPV I, L.P. (the "**DIP Lender**") has agreed to provide a postpetition term loan facility (the "**DIP Credit Facility**") in the amount of $5,700,000 pursuant to that certain Senior Secured Super-Priority Debtor-in-Possession Loan and Security Agreement by and among the Debtors and the DIP Lender (the "**DIP Credit Agreement**").  Concurrently herewith, the Debtors seek authority to enter into the DIP Credit Agreement, grant to certain creditors senior liens, junior liens, and claims with superpriority administrative expense status, use cash collateral, provide "adequate protection" to prepetition secured lenders, and schedule a final hearing with respect to the relief requested, all as more fully described in the relevant motion.

75.    As part of the process of obtaining and negotiating debtor in possession financing, the Debtors' investment banker and financial advisor, Chardan Capital Markets, LLC, contacted a number of potential sources of financing in order to obtain the best terms possible for the Debtors.  As described in more detail in the DIP Motion, the DIP Lender would be granted a priming lien.

76.    The DIP Credit Facility is a $5.7 million term loan credit facility.  I understand that all of the Debtors' prepetition secured lenders, who have liens that will be

primed by liens granted to secure the DIP Credit Facility, have either explicitly consented or are deemed to have consented, pursuant to the terms of an intercreditor agreement, to the priming of their liens and to the Debtors' use of cash collateral. The Debtors conducted an extensive marketing process and determined that the DIP Credit Facility has the best terms and is the only source available to the Debtors for debtor in possession financing.

77.    On an interim basis, the Debtors are requesting access to $1.5 million of the $5.7 million in availability under the DIP Facility. Such amounts will be used to provide necessary and sufficient working capital in connection with the Debtors' operations (in accordance with the budget attached to the DIP Credit Agreement as Exhibit B-2).

78.    The reasons supporting the Debtors' request for authority to enter into the DIP Credit Facility are compelling. As explained in greater detail in the DIP Motion, the DIP Credit Facility will be used to provide liquidity for working capital and other general corporate purposes of the Debtors. The usage of cash collateral and the funds available under the DIP Credit Facility will provide the Debtors with funds necessary for the operation of their businesses, including meeting their payroll and other business obligations. Without the immediate use of cash collateral and the funds available under the DIP Credit Facility, the Debtors would be unable to fund their operations, which would be catastrophic for the Debtors' businesses and their efforts to maximize and preserve the value of their assets. I believe that access to cash collateral and the funds available under the DIP Credit Facility is crucial to the Debtors' ability to maintain their businesses and to avoid immediate and irreparable harm to their estates, employees, customers, and creditors. Further, the terms of the DIP Credit Facility are reasonable as they include favorable pricing terms, reasonable adequate protection measures for the prepetition secured creditors' interests and reasonable fees payable to the DIP Lenders.

79.     For the foregoing reasons, I believe that the DIP Credit Facility embody the best available financing under these circumstances and that entry into the DIP Credit Agreement is in the best interest of the Debtors and their estates.

**CONCLUSION**

In furtherance of their reorganization efforts, the Debtors respectfully request that orders granting the relief requested in the First Day Motions be entered.

Dated:  October _10_, 2016
        Wilmington, Delaware

                                    IMX Acquisition Corp., et al.,
                                    Debtors and Debtors in Possession

                                    Roger P. Deschenes
                                    Vice President, Finance,
                                    Chief Financial Officer and/or Authorized
                                    Signatory of Debtors and Debtors in Possession

**Exhibit A**
Organizational Structure



**Exhibit B**
Schedule of Prepetition Indebtedness

| Debtors' Prepetition Indebtedness | | | | | |
|---|---|---|---|---|---|
| **Issuance** | **Holder** | **Priority** | **Principal Outstanding** | **Interest Outstanding** | **Total Outstanding** |
| **2014 Notes** <br><br> Issued pursuant to the 2014 Note Purchase Agreement | BAM Administrative Services LLC | First Lien | $20,000,000.00 | $3,200,000.00 | $23,200,000.00 |
| **2008 Note** <br><br> Issued pursuant to the 2008 Note and Warrant Purchase Agreement | Montsant Partners, LLC | Second Lien | $5,283,754.56 | $202,543.52 | $5,486,298.08 |
| **2009 Note** <br><br> Issued pursuant to the First Amendment to Note and Warrant Purchase Agreement | DMRJ Group LLC | Second Lien | $1,000,000.00 | $1,187,999.46 | $2,187,999.46 |
| **2012 Note** <br><br> Issued pursuant to the Omnibus Ninth Amendment to Credit Agreement and Eleventh Amendment to Note and Warrant Purchase Agreement | DMRJ Group LLC | Second Lien | $11,970,000.00 | $592,648.46 | $12,562,648.46 |
| **2013 Note** <br><br> Issued pursuant to the Omnibus Tenth Amendment to Credit Agreement and Twelfth Amendment to Note and Warrant Purchase Agreement | DMRJ Group LLC | Second Lien | $17,523,455.00 | $671,732.48 | $18,195,187.48 |
| **Revolving Note** <br><br> Amended and Restated Promissory Note | DMRJ Group LLC | Second Lien | $17,662,137.93 | $4,830,538.91 | $22,492,676.84 |