**<u>EXHIBIT 1</u>**

Revised Proposed Bidding Procedures Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------x
In re                              :    Chapter 11
                                   :
IMX Acquisition Corp., et al.,¹    :    Case No. 16-12238 (BLS)
                                   :
            Debtors.               :    Jointly Administered
                                   :
-------------------------------------------------------x    Ref. Docket No.:  15
```

## ORDER GRANTING MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE FOR AN ORDER (A) APPROVING AND AUTHORIZING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL THE ASSETS, (B) APPROVING AND AUTHORIZING THE BID PROTECTIONS; (C) SCHEDULING THE RELATED AUCTION AND HEARING TO CONSIDER APPROVAL OF THE SALE; (D) APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (E) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (F) GRANTING RELATED RELIEF

This matter coming before the Court on the motion (the "**Motion**")[2] of the above-captioned debtors and debtors in possession (each a "Debtor", and collectively, the "**Debtors**") for the entry of an order pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedures of the Bankruptcy Court for the District of Delaware (the "**Local Rules**") (i)(a) approving and authorizing certain bidding procedures in connection with the sale (the "**Sale**") of substantially all of the Debtors' assets (as

---

[1]  The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  IMX Acquisition Corp. (9838); Implant Sciences Corporation (7126); C Acquisition Corp. (8021); Accurel Systems International Corporation (3856).  The Debtors' headquarters are located at 500 Research Drive, Unit 3, Wilmington, MA 01887.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or Lead Agreement, as appropriate.

attached hereto as <u>Exhibit 1</u>, the "**Bidding Procedures**"); (b) approving and authorizing the Break-Up Fee and Expense Reimbursement (collectively, the "**Bid Protections**"); (c) scheduling the related auction and hearing to consider approval of sale; (d) approving procedures related to the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases; (e) approving the form and manner of notice thereof; and (f) granting related relief (collectively, the "**Bidding Procedures Relief**"); and (ii)(a) authorizing the sale of such assets free and clear of liens, claims, encumbrances, and other interests, except as provided by the Lead Agreement (as defined below); (b) approving the assumption and assignment of certain of the Debtors' executory contracts (each, an "**Executory Contract**") and unexpired leases (each, an "**Unexpired Lease**") related thereto (any such Executory Contract or Unexpired Lease designated by the Lead Purchaser to be assumed and assigned pursuant to the Sale (as defined below) an "**Assumed Contract**," and collectively, the "**Assumed Contracts**"); and (c) granting related relief; the Court having reviewed the Motion and the Court having found that (i) the Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; (ii) venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b); (iv) notice of the Motion was sufficient under the circumstances and complied with all applicable requirements of the Bankruptcy Code, Bankruptcy Rules, and Local Rules; and the United States Trustee having filed an objection to the Bidding Procedures Relief on October 24, 2016; and the Official Committee of Equity Security Holders (the "**Equity Committee**") having filed an objection to the Bidding Procedures Relief on October 25, 2016; and a hearing having been held to consider the Bidding Procedures Relief; and after due

deliberation the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates and their creditors; and good and sufficient cause having been shown;

AND FURTHER FOUND AND DETERMINED THAT:

A.      The Debtors have demonstrated good and sufficient reasons for, and the best interests of their estates, creditors, and other parties in interest will be served by, this Court granting, to the extent provided herein, the relief requested in the Motion relating to the bidding process, including approval of (1) the Bidding Procedures, (2) the Bid Protections provided for in the Asset Purchase Agreement, by and between the Debtors and L-3 Communications Corporation (the "**Lead Purchaser**"), dated as of October 10, 2016 (including all exhibits, schedules and ancillary agreements related thereto, and as may be amended, supplemented or modified pursuant to its terms, including that certain second amendment dated October [27], 2016, the "**Lead Agreement**"), which contemplates the sale of the Purchased Assets to the Lead Purchaser (the "**Sale**"), (3) the procedures described below for the determination of the amounts necessary to cure defaults under the Assumed Contracts so as to permit the assumption and assignment under section 365 of the Bankruptcy Code of the Assumed Contracts that may be assumed and assigned to the Lead Purchaser, and (4) the forms of the Sales Notice and Cure Notice attached to the Motion as Exhibit D and Exhibit E, respectively.

B.      The Debtors have demonstrated good and sufficient reasons for, and the best interests of their estates will be served by, this Court scheduling a Sale Hearing to consider granting the other relief requested in the Motion, including approval of the Sale and the transfer of the Purchased Assets to the Successful Bidder (as defined in the Bidding Procedures) free and

clear of all liens, claims, encumbrances and other interests pursuant to section 363(f) of the Bankruptcy Code.

C.    The Bid Protections as set forth in Article 8.2 of the Lead Agreement required to be paid under the circumstances described therein to the Lead Purchaser are: (1) an actual and necessary cost of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code; (2) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Lead Purchaser; (3) reasonable and appropriate in light of the size and nature of the proposed Sale and comparable transactions, the commitments that have been made, the condition of the Purchased Assets, and the efforts that have been and will be expended by the Lead Purchaser; and (4) a condition to and necessary to induce the Lead Purchaser to continue to pursue the Sale and to continue to be bound by the Lead Agreement.

D.    Unless it is assured that the Bid Protections will be available, the Lead Purchaser is unwilling to remain obligated to consummate the Sale or otherwise be bound under the Lead Agreement (including the obligations to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated by the Bidding Procedures).  The Bid Protections induced the Lead Purchaser to submit a bid that will serve as a minimum or floor bid for the Purchased Assets on which the Debtors, their creditors and other bidders can rely, and which encourages and facilitates the Auction process.  The Lead Purchaser has thus provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Purchased Assets will be realized.  Accordingly, the Bid Protections are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

E.     The Bidding Procedures are fair, reasonable, and appropriate and are designed to maximize the recovery from the Sale of the Purchased Assets.

F.     The process for submitting Qualified Bids is fair, reasonable, and appropriate and is designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and parties in interest.

G.     The Sales Notice and Cure Notice (each as defined below) are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of this Order, the Bidding Procedures, the Sale, the Sale Hearing, and any and all objection deadlines related thereto, including with respect to cure amounts and the assumption and assignment of Executory Contracts and Unexpired Leases, and no other or further notice is required of the foregoing.

H.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

IT IS HEREBY ORDERED THAT:

1.     The Bidding Procedures Relief is GRANTED, to the extent set forth herein.

2.     All objections to the relief requested in the Motion that have not been withdrawn, waived or settled are overruled on the merits.

3.     The Bidding Procedures attached hereto as <u>Exhibit 1</u> are APPROVED and shall govern all bids and bid proceedings relating to the sale of the Purchased Assets.

4.     The Debtors may proceed with the Sale in accordance with the Bidding Procedures and are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures (subject to the terms thereof) in accordance with the following timeline:

01:19437108.2

| Proposed Sale Timeline | |
|---|---|
| Deadline to Serve Sale Notice and Cure Notice | October 31, 2016 |
| Cure Objection Deadline and Assignment Objection Deadline | November 21, 2016 at 4:00 p.m. (ET) |
| Bid Deadline | December 8, 2016 at 4:00 p.m. (ET) |
| Sale Objection Deadline | December 8, 2016 at 4:00 p.m. (ET) |
| Deadline to Notify Qualified Bidders | December 9, 2016 |
| Auction (if required) | December 12, 2016 at 10:00 a.m. (ET) |
| Notice of Successful Bidder | December 13, 2016 |
| Sale Reply Deadline | December 14, 2016 |
| Sale Hearing | December 16, 2016  at 9:30 a.m. (ET) |

5.       The Bid Protections are APPROVED and the Debtors are required, subject to

paragraph 6 below, to pay the Bid Protections when and as set forth in the Lead Agreement as

administrative claims of the estate, which Bid Protections shall survive termination of the Lead

Agreement and shall be binding and enforceable against each Debtor and its respective estates,

any trustee, examiner or other representative of the Debtors' estates.  The Debtors shall comply

with the Bidding Procedures and Bid Protections approved hereby and as set forth in the Lead

Agreement and, until the termination thereof, such other covenants and obligations set forth

therein.  The Bid Protections will constitute, pursuant to section 503 of the Bankruptcy Code, a

superpriority administrative expense claim in each of the Debtors' bankruptcy estates with

priority over any and all administrative expense claims other than (x) superpriority claims

granted pursuant to the DIP Financing Order to the provider of debtor-in-possession financing

and (y) administrative expense claims included within the "Carve-Out" in the DIP Financing

Order to which the DIP Lender's claims are subject. Any Bid Protections payable pursuant to the

terms of the Lead Agreement shall be payable without any further order of the Bankruptcy Court.

6.        For the avoidance of doubt, if the Lead Purchaser is entitled to the Expense

Reimbursement, (i) such Expense Reimbursement shall be limited to reasonable, actual, and

documented out-of-pocket fees and expenses, and (ii) the Lead Purchaser shall submit an invoice

(the "Invoice") to the Debtors, the Equity Committee, and the U.S. Trustee evidencing such fees

and expenses, which Invoice may be redacted for privileged information.  If either the Debtors,

the Equity Committee, or the U.S. Trustee objects for any reason to the payment of all or any

portion of the Expense Reimbursement, such party must file and serve an objection so as to be

received by the other service parties no later than ten (10) days after the submission of the

Invoice.  If no party objects to the Expense Reimbursement within such ten-day period, it shall

be payable as provided for pursuant to the terms of the Lead Agreement.  Any portion of the

Expense Reimbursement that is the subject of an objection will not be payable unless

consensually resolved by the parties or determined by the Court, and any portion of the Expense

Reimbursement that is not subject to an objection shall be paid ten (10) days after submission of

the invoice.

7.        The Debtors shall have the exclusive right, in consultation with their advisors and

the Equity Committee, to determine whether a bid is a Qualified Bid and shall notify Potential

Bidders, the Lead Purchaser, and the Notice Parties whether their bids have been recognized as

such within one (1) Business Day after the Bid Deadline; provided, however, that the Lead

Purchaser is hereby deemed a Qualified Bidder, and the Lead Agreement submitted to the

Debtors by the Lead Purchaser and appended to the Motion as Exhibit B, is deemed a Qualified

Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale. The Lead

Purchaser shall not be required to take any further action in order to participate in the Auction (if any) or, if the Lead Purchaser is the Successful Bidder, to be named the Successful Bidder at the Sale Hearing.

8.       Any disputes as to the selection of a Qualified Bid shall be resolved by this Court.

9.       The Debtors are authorized to conduct an Auction if they receive one or more Qualified Bids in addition to the Lead Agreement.  The Auction, if necessary, shall be held at 10:00 a.m. (prevailing Eastern Time) on December 12, 2016, at the offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, or such other location as shall be timely communicated to all Qualified Bidders.  If no other Qualifying Bid is received, no Auction shall be necessary.

10.      The Debtors shall arrange for the bidding at the Auction to be transcribed by a court reporter. Each Qualified Bidder shall be required to confirm its bid on the record at the Auction and confirm that it has not engaged in any collusion with respect to the bidding or the sale.

11.      If the Auction is held, the Debtors shall file with the Court notice of the Successful Bid(s) and Successful Bidder(s) on or before one (1) Business Day after the Auction.

12.      The Sale Hearing shall be held on December 16, 2016 at 9:30 a.m. (prevailing Eastern Time) before this Court, the U.S. Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801, 6th Floor, Courtroom 1.  Any objections to the Sale must (a) be in writing, (b) state the basis of such objection with specificity, (c) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the District of Delaware and (d) be filed with the Bankruptcy Court and served in accordance with the rules of the Bankruptcy Court upon: (i) counsel to the Debtors:

Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019 (Attn:  Paul

V. Shalhoub, Esq. (pshalhoub@willkie.com)) and Young Conaway Stargatt & Taylor, LLP,

1000 N. King Street, Wilmington, Delaware 19801 (Attn:  Matthew B. Lunn, Esq.

(mlunn@ycst.com) and Donald J. Bowman, Jr., Esq. (dbowman@ycst.com)) so as to be received

by the Debtors not later than 4:00 p.m. EST on December 8, 2016; (ii) counsel to the Lead

Purchaser:  Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York

10017 (Attn:  Sandy Qusba, Esq. (squsba@stblaw.com)); (iii) counsel to the Equity Committee:

Brown Rudnick, LLP, Seven Times Square, New York, New York 10036 (Attn:  Sunni Beville,

Esq. (sbeville@brownrudnick.com)); and (iv) the Office of the United States Trustee for the

District of Delaware (collectively, the "Service Parties").

13.     The following forms of notice are approved: (a) Notice of Sale Procedures,

Auction Date, and Sale Hearing, in the form substantially similar to that attached to the Motion

as Exhibit D (the "Sales Notice") and (b) the Notice to Counterparties to Executory Contracts

and Unexpired Leases of the Debtors That May Be Assumed and Assigned (the "Cure Notice"),

in the form substantially similar to that attached to the Motion as Exhibit E.

14.     The Debtors shall, on or before October 31, 2016, serve a copy of the Sales

Notice and this Order by first class mail, postage prepaid on:  (a) the Office of the United States

Trustee for the District of Delaware; (b) the Office of the United States Attorney for the District

of Delaware; (c) counsel to the Equity Committee:  Brown Rudnick, LLP, Seven Times Square,

New York, New York 10036 (Attn:  Sunni Beville, Esq. (sbeville@brownrudnick.com); (d) the

Internal Revenue Service; (e) counsel to the Debtors' prepetition and postpetition lenders;

(f) counsel to the Lead Purchaser; (g) all persons known by the Debtors to have expressed an

interest to the Debtors in a transaction with respect to the Assets during the previous six months;

(h) all entities known by the Debtors that may have a lien, claim, encumbrance, or other interest in the Assets (for which identifying information and addresses are available to the Debtors); (i) all non-Debtor parties to the Executory Contracts and Unexpired Leases; (j) all of the Debtors' known creditors, (k) any governmental unit known to the Debtors to have a claim in these cases; (*l*) the Office of the Attorney General in each state in which the Debtors operate; (m) the Office of the Delaware Secretary of State; and (n) all parties that have requested notice in these cases under Bankruptcy Rule 2002.

15.     The Debtors shall, on or before October 31, 2016, serve the Cure Notice upon each non-Debtor counterparty to each Executory Contract and Unexpired Lease and their counsel (if known) and the United States Department of Justice, Civil Division, if the non-Debtor counterparty is a department agency or instrumentality of the United States.  The Cure Notice shall state the date, time and place of the Sale Hearing, whether such Executory Contract or Unexpired Lease is designated to be assumed and assigned to the Lead Purchaser, as well as the date by which any objection to the assumption and assignment of such Executory Contract or Unexpired Lease must be filed and served.  The Cure Notice also will identify the amounts, if any, that the Debtors believe are owed to each counterparty to an Executory Contract or Unexpired Lease in order to cure any defaults that exist under such contract or lease (the "Cure Amounts") pursuant to section 365 of the Bankruptcy Code.  The Cure Notice does not constitute an admission that an Executory Contract or Unexpired Lease is in fact an executory contract or unexpired lease, and the Debtors reserve any and all rights with respect to the Executory Contracts and Unexpired Leases.

16.     If any counterparty to an Executory Contract or Unexpired Lease objects for any reason to the Cure Amounts set forth in the Cure Notice, such counterparty must file with the

Court a written objection (a "Cure Amount Objection") and serve such Cure Amount Objection

so as to be received by the Service Parties by no later than November 21, 2016 at 4:00 p.m.

(prevailing Eastern Time) (the "Cure Objection Deadline").

17.    If, at any time after the entry of this Order, the Debtors or any Qualified Bidder

identify additional executory contracts or unexpired leases to be assumed and assigned as

Assumed Contracts (whether before or after the closing of the sale), as applicable, the Debtors

shall serve a supplemental Cure Notice (the "Supplemental Cure Notice") by facsimile,

electronic transmission, hand delivery or overnight mail on the applicable non-debtor

counterparty and its counsel (if known) and the United States Department of Justice, Civil

Division, if the non-Debtor counterparty is a department agency or instrumentality of the United

States, no later than ten (10) days before the proposed effective date of the assignment.  Each

Supplemental Cure Notice shall (i) state the date, time and place of the Sale Hearing, (ii) state

the date by which any objection to the assumption and assignment of such Assumed Contract

must be filed and served, and (iii) identify the Cure Amount.

18.    Unless the non-debtor counterparty properly files and serves an objection to the

Supplemental Cure Notice (the "Supplemental Cure Amount Objection") on or before ten (10)

days after the date the Supplemental Cure Notice (the "Supplemental Cure Objection Deadline"),

the Debtors shall be authorized to assume and assign the Executory Contract or Unexpired

Lease, subject to the occurrence of the Closing without further notice or order of the Court.

19.    Each Cure Amount Objection and Supplemental Cure Amount Objection must set

forth with specificity each and every asserted default in any Executory Contract or Unexpired

Lease and the monetary cure amount asserted by such counterparty to the extent it differs from

the amount, if any, specified by the Debtors in the Cure Notice or Supplemental Cure Notice, as applicable.

20.     In the event that the Debtors and the non-debtor party cannot resolve the Cure Amount Objection or Supplemental Cure Amount Objection, disputed Cure Amounts ("Disputed Cure Amounts") shall not be paid until the resolution of any such disputes by the Court or mutual agreement of the Debtors, the Successful Bidder and the objecting party. Cure Amount Objections may be resolved by the Court at the Sale Hearing, or at a separate hearing either before or after the Sale Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely file and serve a Cure Amount Objection or Supplemental Cure Amount Objection shall be forever barred from asserting that a Cure Amount is owed in an amount in excess of that set forth in the Cure Notice or Supplemental Cure Notice. If no timely Cure Objection or Supplemental Cure Amount Objection is filed and served with respect to an Assumed Contract, the Cure Amount identified in the Cure Notice or Supplemental Cure Notice with respect to such Assumed Contract will be the only amounts necessary under section 365(b) of the Bankruptcy Code to cure all monetary defaults under such Assumed Contract if the Lead Purchaser (or other Successful Bidder) ultimately decides to have the applicable Assumed Contract assumed and assigned to it. Any party failing to timely file a Cure Amount Objection or Supplemental Cure Amount Objection shall be forever barred from objecting to the Cure Amounts and from asserting any additional cure or other amounts against the Debtors, their estates or the Successful Bidder.

21.     If an Executory Contract or Unexpired Lease is assumed and assigned pursuant to Court Order, then except for any such Assumed Contract that is subject to Disputed Cure Amounts, the Assumed Contract counterparty shall be paid the Cure Amount, if any, as set forth

in the Cure Notice or Supplemental Cure Notice, as applicable, with payment to be made pursuant to the terms of the Successful Bidder's Asset Purchase Agreement.

22.     If any counterparty to an Executory Contract or Unexpired Lease objects for any reason to the assumption and assignment of such Executory Contract or Unexpired Lease with respect to the Lead Purchaser (other than a Cure Amount Objection, an "Assignment Objection"), such counterparty must file and serve such Assignment Objection so as to be received by the Service Parties by no later than (the "Assignment Objection Deadline"): (i) 4:00 p.m. (prevailing Eastern Time) on November 21, 2016; or (ii) the date otherwise specified in the Cure Notice (or, alternatively, the date set forth in the motion to assume such Assumed Contract if such contract is to be assumed and assigned after the Sale Hearing); provided that, if the Successful Bidder is not the Lead Purchaser the Assignment Objection Deadline shall be one (1) day prior to the Sale Hearing. The Court shall make any and all determinations concerning adequate assurance of future performance under the Assumed Contracts pursuant to sections 365(b) and (f)(2) of the Bankruptcy Code at the Sale Hearing.

23.     Except to the extent otherwise provided in the Successful Bidder's Asset Purchase Agreement, the Debtors and the Debtors' estates shall be relieved of all liability accruing or arising after the assumption and assignment of the Assumed Contracts pursuant to section 365(k) of the Bankruptcy Code.

24.     Notwithstanding any provision in this Order, the Lead Agreement or the Bidding Procedures, this Order does not satisfy, and the Court has not yet determined if the Debtors have satisfied, the requirements of section 365 of the Bankruptcy Code for any particular Assumed Contract, including those relating to the cure of any existing default or providing adequate assurance of future performance. No Assumed Contract will be deemed assumed and assigned

until the later of (a) the date the Court has entered an order authorizing the assumption and assignment of a particular Assumed Contract or (b) the date the Sale is closed. The Successful Bidder will have no rights in and to any particular Assumed Contract until such time as the particular Assumed Contract is assumed and assigned to the Successful Bidder.

25.     Subject to the terms of the Lead Agreement and the Bidding Procedures, the Debtors are authorized to take such actions as may be necessary or appropriate to implement and affect the terms and requirements of this Order, including, but not limited to, expending such funds or taking such action as may be necessary or appropriate to comply with the Bidding Procedures.

26.     To the extent the provisions of this Order are expressly inconsistent with the provisions of any Exhibit referenced herein, including the Bidding Procedures, or with the Motion, the provisions of this Order shall control.

27.     The Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order.

28.     Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable.

Dated:   October _____, 2016
             Wilmington, Delaware

_____
Brendan L. Shannon
Chief United States Bankruptcy Judge

**<u>Exhibit 1</u>**

**Bidding Procedures**

## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") for the proposed sale of all or substantially all of the assets and assumption of certain liabilities of Implant Sciences Corporation, IMX Acquisition Corp., C Acquisition Corp., and Accurel Systems International Corporation (collectively, the "Debtors" or the "Sellers"), in connection with the jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), lead case number 16-12238 (BLS).

The Sellers entered into that certain asset purchase agreement, dated October 10, 2016 between the Sellers on the one hand and L-3 Communications Corporation (the "Lead Purchaser"), pursuant to which the Lead Purchaser has agreed to acquire the purchased assets (the "Purchased Assets") and has agreed to assume certain specified liabilities on the terms and conditions specified therein (together with the schedules and related documents thereto, and as may be amended, supplemented or otherwise modified, the "Lead Agreement").

The Lead Purchaser has submitted a Qualified Bid (as defined below) consisting of (a) the assumption of the Assumed Liabilities and (b) a cash payment equal to the sum of (i) $117.5 million of cash plus (ii) the amount, if any, by which the Estimated Net Working Capital is greater than the Target Net Working Capital minus (iii) the amount, if any, by which the Estimated Net Working Capital is less than the Target Net Working Capital (the "Lead Bid").[1]

The sale transaction pursuant to the Lead Agreement is subject to competitive bidding as set forth herein.  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Motion for the approval of the Bidding Procedures (the "Approval Motion") [Docket No. 15].

A.    ASSETS TO BE SOLD

The Sellers seek to complete a sale of the Purchased Assets and the assumption of the Assumed Liabilities described in Sections 1.1 and 1.3 respectively of the Lead Agreement.  Except as otherwise provided in the Lead Agreement or such other approved purchase agreement of the Successful Bidder (as defined below), all of the Sellers' right, title and interest in and to each Purchased Asset to be acquired shall be sold free and clear of all liens, claims, interests, charges, restrictions and encumbrances of any kind or nature thereon and there against (collectively, the "Liens"), such Liens to attach solely to the net proceeds of the sale of such Purchased Assets.

B.    THE BID PROCEDURES

To ensure that the Sellers receive the maximum value for the Purchased Assets, the Lead Agreement is subject to higher or otherwise better offers, and, as such, the Lead Agreement will serve as the "stalking-horse" bid for the Purchased Assets.

---

[1]  Capitalized terms used but not otherwise defined in this paragraph shall have the meanings ascribed to such terms in the Lead Agreement.

1.      Provisions Governing Qualifications of Bidders

In order to participate in the bidding process, prior to the Bid Deadline (defined below), each person other than the Lead Purchaser who wishes to participate in the bidding process (a "Potential Bidder") must deliver the following to the Notice Parties (as defined below):

        a.      a written disclosure of the identity of each entity including all affiliates, equity sources or other parties that will be or is associated with  bidding for the Purchased Assets or otherwise participating in connection with such bid and the complete terms of any such participation; and

        b.      an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Sellers, in substantially the same form as signed by the Lead Purchaser and which shall inure to the benefit of any purchaser of the Purchased Assets; without limiting the foregoing, each confidentiality agreement executed by a Potential Bidder shall contain standard non-solicitation provisions.

A Potential Bidder that delivers the documents and information described above and that the Sellers determine in their reasonable business judgment, after consultation with their advisors and the Official Committee of Equity Security Holders (the "Equity Committee"), is likely (based on availability of committed capital, experience and other considerations) to submit a bona fide offer and be able to consummate the sale including without limitation obtaining all required regulatory or government agency approvals, will be deemed a "Qualified Bidder." The Sellers will limit access to due diligence to those parties they believe, in the exercise of their reasonable judgment, are pursuing the transaction in good faith.

As promptly as practicable after a Potential Bidder delivers all of the materials required above (and in any event no later than one (1) business day thereafter), the Sellers will determine, after consultation with the Equity Committee, and will notify the Potential Bidder if such Potential Bidder is a Qualified Bidder and the Sellers shall contemporaneously notify the Lead Purchaser and the Notice Parties.

2.      Due Diligence

The Sellers will afford any Qualified Bidder such due diligence access or additional information as the Sellers, in consultation with their advisors, and the Equity Committee, deem appropriate, in their reasonable discretion, subject to contractual obligations to limit access to certain proprietary information; provided, however, the Sellers will, in their reasonable discretion, make reasonable commercial efforts to provide Qualified Bidders with the same information provided to the Lead Purchaser.  The Sellers must promptly advise the Lead Purchaser and the Equity Committee in the event any other Qualified Bidder receives diligence the Lead Purchaser has not previously received and shall promptly be provided with access to such diligence materials.

The due diligence period shall end on the Bid Deadline, and the Sellers shall not furnish any due diligence information to any Qualified Bidder (other than the Successful Bidder) after the Bid Deadline. For the avoidance of doubt, neither the Sellers nor any of their respective

representatives shall be obligated to furnish any due diligence information to any person other than a Qualified Bidder.

      3.      Provisions Governing Qualified Bids

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "Qualified Bid"):

      a.      it fully discloses the identity of the Qualified Bidder;

      b.      it states that the applicable Qualified Bidder offers to purchase, in cash, the Purchased Assets upon terms and conditions that the Sellers reasonably determine, after consultation with the Equity Committee, are at least as favorable to the Sellers as those set forth in the Lead Agreement, and it provides a description of any anticipated regulatory or governmental approvals necessary to consummate the bid;

      c.      it includes a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such bidder is selected as the Successful Bidder its offer shall remain irrevocable until the earlier of (a) the closing of the sale to the Successful Bidder, and (b) sixty (60) days after entry of the Sale Order.  Such writing shall guaranty performance of the Qualified Bidder by its parent entities, if any, or provide such other guaranty of performance acceptable to Sellers in their reasonable discretion;

      d.      confirmation that all necessary internal and shareholder approvals have been obtained prior to the bid;

      e.      it includes a duly authorized and executed copy of an asset purchase agreement, including the purchase price for the Purchased Assets expressed in U.S. Dollars, together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Lead Agreement (the "Proposed Asset Purchase Agreement") and the proposed form of sale approval order to approve the sale by the Bankruptcy Court, together with a copy marked to show amendments and modifications to the proposed form of sale approval order attached to the Approval Motion; provided however, that such Proposed Asset Purchase Agreement shall not include any financing or diligence conditions;

      f.      it includes written evidence of sufficient cash on hand to fund the purchase price or sources of immediately available funds that are not conditioned on third party approvals or commitments, that will allow the Sellers to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Proposed Asset Purchase Agreement; such written evidence shall include the most current audited and the most current unaudited financial statements, or such other financial information as may be acceptable to the Sellers in their reasonable discretion after consultation with the Equity Committee (collectively, the "Financials") of the

Qualified Bidder, or, if the Qualified Bidder is an entity formed for the purpose of acquiring the Purchased Assets, the Financials of the Qualified Bidder's equity holder(s) or other financial backer(s) that are guaranteeing the Qualified Bidder's performance;

g.      it provides for a cash purchase price that exceeds the aggregate cash consideration to be paid to or for the benefit of the Sellers' estates set forth in the Lead Bid by at least $8,025,000, which represents the sum of (A) the amount of the Break-Up Fee (as defined below) of $3,525,000, plus (B) the Expense Reimbursement (not to exceed $1,500,000), which cost shall be limited to reasonable, actual, and documented out-of-pocket fees and expenses, plus (C) $3,000,000 and otherwise has a value to the Sellers, in the Sellers' exercise of their reasonable business judgment, after consultation with their advisors, that is greater or otherwise better than the value offered under the Lead Agreement including impact of the liabilities assumed in the Lead Agreement;

h.      it identifies with particularity which executory contracts and unexpired leases the Qualified Bidder wishes to reject and provides details of the Qualified Bidder's proposal for the treatment of related cure costs;

i.      it includes an acknowledgement and representation that the Qualified Bidder:  (A) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Proposed Asset Purchase Agreement; and (D) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

j.      it includes evidence, in form and substance reasonably satisfactory to the Sellers, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Proposed Asset Purchase Agreement;

k.      it contains a detailed description of how the Qualified Bidder intends to treat current employees of the Sellers;

l.      it contains sufficient information concerning the Qualified Bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases to be assumed and assigned;

m.      it states that the Qualified Bidder consents to the jurisdiction of the Bankruptcy Court;

n.    it contains such other information reasonably requested by the Sellers; and

o.    it is received on or prior to the Bid Deadline.

Notwithstanding anything in these Bidding Procedures to the contrary, the Lead Purchaser is deemed to be a Qualified Bidder, the Lead Bid is deemed to be a Qualified Bid for all purposes in connection with the Bidding Procedures, the Auction, and the sale, and the Lead Purchaser shall not be required to take any further action in order to participate in the Auction (if any) or, if the Lead Purchaser is the Successful Bidder, to be named the Successful Bidder at the Sale Hearing (as defined below).

The Sellers shall notify the Lead Purchaser, all Qualified Bidders, and the Notice Parties in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid other than the Lead Purchaser, whether such Qualified Bidder's bid constitutes a Qualified Bid) promptly after, and in any event on the same day as, the notification to any Qualified Bidder that their bid constitutes a Qualified Bid; provided, however, that such notification shall not be given later than one (1) business day following the expiration of the Bid Deadline.

4.    Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"):  (i) counsel to the Sellers:  Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019 (Attn:  Paul V. Shalhoub, Esq. (pshalhoub@willkie.com)) and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801 (Attn:  Matthew B. Lunn, Esq. (mlunn@ycst.com)); (ii) counsel to the Lead Purchaser:  Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Attn:  Sandy Qusba (squsba@stblaw.com)); (iii) counsel to Platinum Partners:  Cole Schotz P.C., 1325 Avenue of the Americas, 19th Floor, New York, New York 10019 (Attn:  Michael D. Sirota, Esq. (msirota@coleschotz.com)); (iv) counsel to BAM Administrative Services LLC, Pachulski Stang Ziehl & Jones LLP, 919 N. Market St, 17th Floor, Wilmington, DE 19801 (Attn:  Jeffrey N. Pomerantz, Esq., Ira Kharasch, Esq., and Peter Keane, Esq. (jpomerantz@pszjlaw.com, ikharasch@pszjlaw.com, pkeane@pszjlaw.com)); (v) counsel to DIP SPV I, L.P. (the "DIP Lender"), Olshan Frome Wolosky LLP, 1325 Avenue of the Americas, New York, New York 10019 (Attn: Adam H. Friedman, Esq. and Jonathan T. Koevary, Esq. (afriedman@olshanlaw.com and jkoevary@olshanlaw.com)); and (vi) counsel to the Equity Committee:  Brown Rudnick, LLP, Seven Times Square, New York, New York 10036 (Attn:  Sunni Beville, Esq. (sbeville@brownrudnick.com), so as to be received by the Notice Parties not later than 4:00 p.m. (prevailing Eastern Time) on  December 8, 2016 (the "Bid Deadline").

5.    Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, (1) the amount of such bid (including value provided by the assumption of liabilities), (2) the risks and timing associated with consummating such bid, (3) any proposed revisions to the Lead

Agreement (including any additional conditions to closing), and (4) any other factors deemed relevant by the Sellers in their reasonable discretion (after consultation with the Equity Committee).

6.      No Qualified Bids

If the Sellers do not receive any Qualified Bids other than the Lead Bid, the Sellers will not hold an auction and the Lead Purchaser will be named the Successful Bidder on the Bid Deadline.

7.      Auction Process.

If the Sellers receive one or more Qualified Bids in addition to the Lead Bid, the Sellers will conduct an auction (the "Auction") of the Purchased Assets, which shall be transcribed, at 10:00 a.m. (EDT) on December 12, 2016 at the offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, or such other location as shall be timely communicated to all entities entitled to attend the Auction.  The Auction shall be conducted in accordance with the following procedures:

> a.      Only the Sellers, the Notice Parties, the members of the Equity Committee, the Lead Purchaser, any other Qualified Bidders that have submitted Qualified Bids, and/or other party as the Sellers may determine to include in their discretion, in each case along with their representatives and advisors, shall be entitled to attend the Auction (such attendance to be in person); if a party that is a creditor of the Debtors, other than those listed above, would like to attend the Auction, such party shall make a request to attend the Auction in writing (which writing may be in the form of an electronic mail) and serve such request on the Notice Parties no later than 12:00 p.m. (prevailing Eastern Time) two (2) business days prior to the date of the Auction;

> b.      only the Lead Purchaser and such other Qualified Bidders that have submitted Qualified Bids on or prior to the Bid Deadline will be entitled to make any subsequent bids at the Auction; provided that all such Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person;

> c.      each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

> d.      at least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Sellers whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (a) the date of the selection of the Successful Bidder at the conclusion of the Auction, or (b) if selected as the Successful Bidder, until (1) the closing of the sale to the Successful Bidder, and (2) sixty (60) days after entry of the Sale Order.  Prior to the start of the Auction, the Sellers will provide copies of the Qualified Bid which

01:19437108.2

the Sellers believe, in their reasonable discretion, is the highest or otherwise best offer (the "Starting Bid") to the Lead Purchaser and all other Qualified Bidders;

e.      all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction;

f.      the Sellers, after consultation with their advisors (and the Equity Committee), may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Court entered in connection herewith, and (ii) provide that bids be made and received on an open basis, with all material terms of each bid to be fully disclosed to all other Qualified Bidders at the Auction and (iii) are disclosed to each Qualified Bidder at the Auction; and

g.      bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each a "Subsequent Bid") providing a net value to the estate of at least an additional $1,000,000 above the prior bid.  After the first round of bidding and between each subsequent round of bidding, the Sellers, after consultation with counsel to the Equity Committee, counsel to Platinum Partners, counsel to BAM Administrative Services LLC, and counsel to the DIP Lender (together, the "Consultation Parties"), shall announce the bid (including the identity of that bidder and the value of such bid) that it believes to be the highest or otherwise best offer (the "Highest Bid").  A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Highest Bid.  Each Qualified Bidder shall either elect to provide a higher bid or withdraw from the Auction. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Lead Purchaser), the Sellers will give effect to the Break-Up Fee and Expense Reimbursement payable to the Lead Purchaser under the Lead Agreement as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Sellers. If the Lead Purchaser bids at the Auction, the Lead Purchaser will be entitled to a "credit" for the Break-Up Fee and Expense Reimbursement.   To the extent a Subsequent Bid has been accepted entirely or in part because of the addition, deletion or modification of a provision or provisions in the applicable Proposed Asset Purchase Agreement or the Lead Agreement, the Sellers will identify such added, deleted or modified provision or provisions.

8.      Selection of Successful Bid

Prior to the conclusion of the Auction, the Sellers, in consultation with their advisors and the Consultation Parties, will review and evaluate each Qualified Bid in accordance with the procedures set forth herein and determine which offer is the highest or otherwise best offer from

among the Qualified Bidders (including the Lead Purchaser) submitted at or prior to the Auction by a Qualified Bidder (such bid, the "Successful Bid" and the bidder making such bid, the "Successful Bidder") and communicate to the Lead Purchaser and the other Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid. The determination of the Successful Bid by the Sellers at the conclusion of the Auction shall be final, subject only to approval by the Bankruptcy Court.

Within two (2) business days after adjournment of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Within one (1) business day after adjournment of the Auction, the Sellers shall file a notice identifying the Successful Bidder with the Bankruptcy Court.

The Sellers will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing.

C.    THE BID PROTECTIONS

In recognition of the expenditure of time, energy, and resources, and because the agreement to make payment thereof is necessary to preserve the value of the Sellers' estates, the Sellers have agreed that, among other triggering events, if the Lead Purchaser is not the Successful Bidder, the Sellers will pay the Lead Purchaser (i) an aggregate fee of approximately $3,525,000 as more fully described in the Lead Agreement (the "Break-Up Fee"), and (ii) an amount in cash equal to the Expense Reimbursement (as such term is defined in the Lead Agreement, the "Expense Reimbursement") not to exceed $1,500,000, whether incurred prior to or after the Petition Date. The Break-Up Fee and Expense Reimbursement shall be payable as provided for pursuant to the terms of the Lead Agreement and nothing herein shall be deemed to limit or otherwise modify the terms thereof, including other circumstances pursuant to which the Breakup-Up Fee and Expense Reimbursement may be payable. For the avoidance of doubt, if the Lead Purchaser is entitled to the Expense Reimbursement, (i) such Expense Reimbursement shall be limited to reasonable, actual, and documented out-of-pocket fees and expenses, and (ii) the Lead Purchaser shall submit an invoice (the "Invoice") to the Debtors, Equity Committee, and U.S. Trustee evidencing such fees and expenses. If either the Debtors, the Equity Committee, or the U.S. Trustee objects for any reason to the payment of all or any portion of the Expense Reimbursement, such party must file and serve an objection so as to be received by the other Service Parties no later than ten (10) days after the submission of the Invoice. If no party objects to the Expense Reimbursement within such ten-day period, it shall be payable as provided for pursuant to the terms of the Lead Agreement. Any portion of the Expense Reimbursement that is the subject of an objection will not be payable unless consensually resolved by the Parties or determined by the Court.

The Sellers have further agreed that their obligation to pay the Break-Up Fee and Expense Reimbursement pursuant to the Lead Agreement shall survive termination of the Lead Agreement and shall constitute a superpriority administrative expense claim under section 503(b) of the Bankruptcy Code, junior in right of payment to outstanding superpriority claims granted under the DIP Financing Order to the provider of DIP financing (to the extent such financing is

permitted under the Lead Agreement) and administrative expense claims included within the carve-out for professional fees in the DIP Financing Order, but senior to any other secured or unsecured creditors, and shall be payable under the terms and conditions of the Lead Agreement and the Bid Procedures Order.

D.     SALE HEARING

The Sellers will seek entry of an order from the Bankruptcy Court at a hearing (the "Sale Hearing") to begin at 9:30 a.m. (prevailing Eastern Time) on December 16, 2016 to approve and authorize the sale transaction to the Successful Bidder on terms and conditions determined in accordance with the Bidding Procedures.

E.     MISCELLANEOUS

The Auction and the Bidding Procedures are solely for the benefit of the Sellers and the Lead Purchaser, and nothing contained in the Bid Procedures Order or the Lead Agreement or the Bidding Procedures shall create any rights in any other person or bidder (including without limitation rights as third party beneficiaries or otherwise) other than the rights expressly granted to a Successful Bidder under the Bid Procedures Order.

In the event the Lead Purchaser is not the Successful Bidder, the Lead Purchaser shall have standing to object to the sale of the Purchased Assets or any portion thereof at the Sale Hearing to the extent such objection is related to the terms of the Lead Agreement (including the failure to adhere to such terms) or the conduct of the Auction and interpretation of these bidding procedures.

The Sellers, after consultation with the Consultation Parties, may modify the rules, procedures and deadlines set forth herein, or adopt new rules, procedures and deadlines that, in their reasonable discretion, will better promote the goals of these procedures, namely, to maximize value for the estates; provided that all modifications and additional rules, procedures and deadlines will be non-material, may in no event extend the dates specified in Bidding Procedures Order, including permitting the submission of Qualified Bids after the close of the Auction and otherwise not conflict with these Bidding Procedures or the Bidding Procedures Order. All such modifications and additional rules will be communicated to each of the Notice Parties, Potential Bidders and Qualified Bidders.

The Bankruptcy Court shall retain jurisdiction to hear and determine all matters arising from or relating to the implementation of the Bid Procedures Order.