## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------x
| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| IMX Acquisition Corp., et al., [1] | : | Case No. 16-12238 (BLS) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
------------------------------------------------------x    **Ref. Docket No.: 13, 52**

### SECOND INTERIM ORDER (I) AUTHORIZING AND APPROVING DEBTORS' POST-PETITION FINANCING; (II) GRANTING LIENS AND SECURITY INTERESTS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) AUTHORIZING USE OF CASH COLLATERAL AND AFFORDING ADEQUATE PROTECTION; (IV) MODIFYING AUTOMATIC STAY AND (V) SCHEDULING FINAL HEARING

This matter coming before this Court on the above-captioned Debtors' *Motion for Entry and Approval of Interim and Final Orders: (A) Authorizing and Approving Postpetition Financing; (B) Granting Liens and Security Interests and Providing Superpriority Administrative Expense Status; (C) Authorizing Use of Cash Collateral and Affording Adequate Protection; (D) Modifying Automatic Stay; and (E) Scheduling Final Hearing, Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364 and Federal Rules of Bankruptcy Procedure 2002 and 4001(c) and (d)* [D.I. 13], as modified on the record of the Second Interim Hearing (the "Motion") at a second interim hearing on November 4, 2016 (the "Second Interim Hearing"), and the *Declaration of Roger Deschenes in Support of Debtors' Chapter 11 Petition and First Day*

---

[1]   The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  IMX Acquisition Corp. (9838); Implant Sciences Corporation (7126); C Acquisition Corp. (8021); Accurel Systems International Corporation (3856).  The Debtors' headquarters are located at 500 Research Drive, Unit 3, Wilmington, MA 01887.

*Motions* [D.I. 16] (the "<u>Deschenes Declaration</u>").  The Motion requests the entry of a second interim order (the "<u>Second Interim Order</u>"):

(a)     authorizing and approving, pursuant to sections 105, 361, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), postpetition financing (the "<u>DIP Facility</u>"), from Tannor Partners Credit Fund, LP (the "<u>DIP Lender</u>") to (i) fund, among other things, ongoing working capital needs of the Debtors, and (ii) pay fees and expenses (including, without limitation, reasonable attorneys' fees and expenses) owed to the DIP Lender under the DIP Facility and the other DIP Facility Documents (as defined below);

(b)     authorizing and directing the Debtors to pay, upon the closing of the DIP Facility, all principal, accrued interest, unpaid fees and expenses and all other amounts due as of the closing to DIP SPV I, L.P. in accordance with the terms and conditions of that certain postpetition financing granted by the First Interim Order;

(c)     authorizing the Debtors to enter into and comply in all respects with the DIP Facility and the other DIP Facility Documents, and approval of all of the terms and conditions of the DIP Facility and the other DIP Facility Documents;

(d)     requesting that the financing under the DIP Facility, including, without limitation, as to all principal, accrued interest, unpaid fees and expenses, indemnification, and all other amounts due from time to time under the documents referred to below, including the Obligations[2] (collectively, the "<u>DIP Facility Obligations</u>"):

---

[2]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the DIP Facility Documents.

(i)      have priority, pursuant to Bankruptcy Code § 364(c)(1), over any and all administrative expenses, subject only to the Carve-Out (as defined below), which allowed superpriority claims of the DIP Lender to be payable from and have recourse to all prepetition and postpetition property of the Debtors, as provided for herein; and

(ii)      pursuant to Bankruptcy Code §§ 364(c)(2), (c)(3) and (d), be deemed to be secured by valid, binding, continuing, enforceable, fully perfected and unavoidable senior security interests in and liens upon (the "DIP Facility Liens"), all current and future assets, properties and rights of the Debtors, and all products and proceeds of any of the foregoing, including insurance policies and proceeds and shall include all assets defined as "Collateral" in the DIP Credit Agreement and this order (each of the foregoing, the "Collateral"), but specifically being subject solely to (x) specified permitted liens, as set forth on Schedule A-1 to the DIP Credit Agreement (the "Permitted Liens"), and (y) the Carve-Out to the extent provided for below,

(e)      authorizing the Debtors' use of the Pre-Petition Secured Parties' Cash Collateral (both as defined below) and granting adequate protection on account of the Pre-Petition Secured Obligations and Pre-Petition Loan Documents (both as defined below) under Bankruptcy Code §§ 105, 361, 362 and 363; and

(f)      requesting, pursuant to Bankruptcy Rule 4001, that a final hearing (the "Final Hearing") be held before this Court to consider entry of an order authorizing and granting the relief granted in the Motion on a final basis (the "Final Order"); and

(g)      granting of certain related relief.

The Debtors having provided sufficient notice, under the circumstances, of the Motion, the relief requested therein, the material terms of this Second Interim Order and the Second

Interim Hearing pursuant to Bankruptcy Rules 4001(b) and 4001(c)(1), on the following parties: (i) all parties who filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; (ii) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (iii) counsel for the Official Committee of Equity Security Holders (the "Equity Committee"); (iv) the office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (v) those other creditors known to the Debtors who may have liens upon or perfected security interests in any of the Debtors' assets and properties; (vi) the Delaware Attorney General; (vii) the U.S. Attorney for the District of Delaware; (viii) the Internal Revenue Service and all state taxing authorities to which the Debtors pay taxes; and (ix) all persons and entities from which the Debtor leases real property, equipment or other personal property (including intellectual property); (collectively, the "Notice Parties").  An interim hearing on the Motion having been held by this Court on October 12, 2016 (the "First Interim Hearing") to consider interim approval of the Motion prior to the modifications requested at the Second Interim Hearing; and the Court having entered, after the First Interim Hearing, that certain *Interim Order (I) Authorizing and Approving the Debtors' Postpetition Financing; (II) Granting Liens and Security Interests and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral and Affording Adequate Protection; (IV) Modifying Automatic Stay; and (V) Scheduling Final Hearing* [Docket No. 52] (the "First Interim Order"); and the Second Interim Hearing having been held on November 4, 2016; and upon the record made by the Debtors at the Interim Hearing and the Second Interim Hearing, including the Motion and other filings and pleadings in the Debtors' chapter 11 cases, and after due deliberation and consideration, and good and sufficient cause appearing therefore;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND
CONCLUSIONS OF LAW:

A.    Petition Date.  On October 10, 2016 (the "Petition Date"), the Debtors filed
voluntary petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy
Court for the District of Delaware (the "Bankruptcy Court" or this "Court").  The Debtors
continue to operate their businesses and manage their properties debtors in possession pursuant
to Bankruptcy Code §§ 1107 and 1108.

B.    Jurisdiction and Venue.  This Court has core jurisdiction over these chapter 11
cases (the "Chapter 11 Cases"), this Motion and the parties and property affected hereby
pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28
U.S.C. §§ 1408 and 1409.

C.    Notice.  Notice of the Second Interim Hearing, the Motion and proposed entry of
this Second Interim Order has been provided to the Notice Parties.  Upon the record presented to
the Court at the Second Interim Hearing, requisite notice of the Motion and the relief requested
thereby and this Second Interim Order has been provided in accordance with Bankruptcy Rules
4001(b) and (c) and 9014, which notice is sufficient for the Motion, and the entry of the Second
Interim Order, and no further notice of, or hearing on, the entry of this Second Interim Order is
necessary or required.

D.    Official Committee.  On October 24, 2016, the U.S. Trustee appointed the Equity
Committee in accordance with Bankruptcy Code § 1102.

E.    Entry of Interim Order.  On October 12, 2016, the Court entered the First Interim
Order.  Among other things, as consideration for the financing provided therein, the First Interim
DIP Order provided Super-Priority Claims and DIP Facility Liens (each as defined in the First

Interim Order) to DIP SPV I, L.P. on account of all DIP Facility Obligations (as defined in the First Interim Order) and a full release set forth in paragraph F(n) of the First Interim Order.

      F.    <u>The Debtors' Stipulations as to Existing Secured Debt</u>.  Subject only to the limitations contained in paragraph 11 of this Second Interim Order, the Debtors, for themselves, their estates and all representatives of such estates, admit, stipulate, acknowledge and agree that:

      (a) Prior to the Petition Date, the Debtors entered into that certain note purchase agreement dated as of March 19, 2014 (together with certain related transaction documents, the "<u>Pre-Petition First Lien Agreement</u>") with BAM Administrative Services LLC ("<u>BAM</u>") as Agent (the "<u>First Lien Agent</u>" and granted to the First Lien Agent, pledges and security interests (the "<u>Pre-Petition BAM Liens</u>") in the collateral described in that certain Security Agreement dated as of March 19, 2014, by and between the Debtors and BAM, including but not limited to the respective Debtors' rights and interests in personal property and any proceeds thereof to the extent provided  (collectively, the "<u>Pre-Petition BAM Collateral</u>").

      (b) As of the Petition Date, the First Lien Agent was owed the aggregate principal amount of not less than $20,000,000.00, plus all accrued interest, fees, and other expenses (including reasonable attorneys' fees) allowed pursuant to the terms of the Pre-Petition First Lien Agreement, incurred in connection with the Prepetition First Lien Agreement (the "<u>Pre-Petition First Lien Obligations</u>").

      (c) Prior to the Petition Date, the Debtors entered into that certain note and warrant purchase agreement dated as of December 10, 2008 (the "<u>Note Purchase Agreement</u>") and that certain revolving credit agreement dated as of September 4, 2009 (together with certain transaction documents, the "<u>Credit Agreement</u>," and, together with the Note Purchase

Agreement, the "Pre-Petition Second Lien Agreements"),[3] with DMRJ Group, LLC ("DMRJ")

as Lender and granted to DMRJ pledges and security interests (the "Pre-Petition DMRJ Liens"

and together with the Pre-Petition BAM Liens, the "Pre-Petition Secured Liens") in the collateral

described in, respectively, that certain Security Agreement dated as of December 10, 2008 by

and between the Debtors and DMRJ, and that certain Security Agreement dated as of September

4, 2009, by and between the Debtors and DMRJ, including but not limited to the respective

Debtors' rights and interests in personal property and any proceeds thereof to the extent

provided (collectively, the "Pre-Petition DMRJ Collateral" and together with the Pre-Petition

BAM Collateral, the "Pre-Petition Collateral").

(d) Pursuant to the Note Purchase Agreement, the Debtors issued a 15% senior

secured convertible promissory note (the "2008 Note") to DMRJ.  On May 4, 2015, DMRJ

assigned its rights, title and interest in the 2008 Note to Montsant Partners, LLC ("Montsant"

and, together with DMRJ, the "Second Lien Lenders").[4]  As of the Petition Date, Montsant is

owed the aggregate principal amount of not less than $5,283,754.56, plus all accrued interest,

fees, and other expenses (including reasonable attorneys' fees) allowed pursuant to the terms of

the 2008 Note Purchase Agreement, incurred in connection with the 2008 Note.

(e) On July 1, 2009, the Debtors and DMRJ entered into that certain First

Amendment to Note and Warrant Purchase Agreement, pursuant to which the Debtors issued a

15% senior secured promissory note to DMRJ (the "2009 Note").  As of the Petition Date,

DMRJ is owed the aggregate principal amount of not less than $1,000,000.00, plus all accrued

interest, fees, and other expenses (including reasonable attorneys' fees) allowed pursuant to the

---

[3]   The Pre-Petition First Lien Agreement and Pre-Petition Second Lien Agreements are referred to herein as the Pre-Petition Loan Agreements.

[4]   The First Lien Agent and the Second Lien Lenders are referred to herein as the "Pre-Petition Secured Parties."

terms of the 2008 Note Purchase Agreement (as amended by the First Amendment to Note and Warrant Purchase Agreement), incurred in connection with the 2009 Note.

(f) On September 29, 2011, the Debtors issued that certain Amended and Restated Promissory Note to DMRJ pursuant to the Credit Agreement (the "Revolving Note"). As of the Petition Date, DMRJ is owed the aggregate principal amount of not less than $17,662,137.93, plus all accrued interest, fees, and other expenses (including reasonable attorneys' fees) allowed pursuant to the terms of the Credit Agreement (as amended by the Amended and Restated Promissory Note), incurred in connection with the Revolving Note.

(g) On September 5, 2012, the Debtors entered into that certain Omnibus Ninth Amendment to Credit Agreement and Eleventh Amendment to Note and Warrant Purchase Agreement, pursuant to which they issued a second senior secured convertible promissory note to DMRJ (the "2012 Note"). As of the Petition Date, DMRJ is owed the aggregate principal amount of not less than $11,970,000.00, plus all accrued interest, fees, and other expenses (including reasonable attorneys' fees) allowed pursuant to the terms of the 2008 Note Purchase Agreement (as amended by the Omnibus Ninth Amendment to Credit Agreement and Eleventh Amendment to Note and Warrant Purchase Agreement), incurred in connection with the 2012 Note.

(h) On February 28, 2013, the Debtors entered into that certain Omnibus Tenth Amendment to Credit Agreement and Twelfth Amendment to Note and Warrant Purchase Agreement, pursuant to which they issued a third 15% senior secured convertible promissory note to DMRJ (the "2013 Note"). As of the Petition Date, DMRJ is owed the aggregate principal amount of not less than $17,523,455.00, plus all accrued interest, fees, and other expenses (including reasonable attorneys' fees) allowed pursuant to the terms of the 2008 Note Purchase

Agreement (as amended by the Omnibus Tenth Amendment to Credit Agreement and Twelfth Amendment to Note and Warrant Purchase Agreement), incurred in connection with the 2013 Note.

(i) Pursuant to that certain intercreditor agreement dated as of March 19, 2014, by and between BAM and DMRJ (the "Intercreditor Agreement"), DMRJ and Montsant have consented to the subordination of the Pre-Petition DMRJ Liens to the Pre-Petition BAM Liens and the payment of the Pre-Petition First Lien Obligations in full prior to the payment of the Pre-Petition Second Lien Obligations.

(j) All Pre-Petition Loan Documents executed and delivered by the Debtors to the Pre-Petition Secured Parties are valid, binding and enforceable in accordance with their terms by the Pre-Petition Secured Parties against the Debtors and not subject to avoidance, whether under the Bankruptcy Code or otherwise. The Pre-Petition Secured Parties duly and validly perfected their liens upon and security interests in the Pre-Petition Collateral by, among other things, filing financing statements, entering into deposit account control agreements and, where necessary, possessing the relevant instruments, certificates, or other property. All of such financing statements were validly authorized by authorized representatives of the Debtors. Pursuant to the Pre-Petition Loan Documents, the Prepetition Secured Parties have properly perfected and non-avoidable security interests in and liens on all of the Pre-Petition Collateral.

(k) As a condition for the financing, each Pre-Petition Secured Party has consented in writing or is deemed to have consented pursuant to the Intercreditor Agreement to the Debtors' entry into the DIP Facility, to the priming of the Pre-Petition Liens and Pre-Petition Secured Obligations through the creation of the DIP Facility Liens and the Super-Priority Claims in favor of the DIP Lender, and the Debtors' use of Cash Collateral.

(l) The liens and security interests of the Pre-Petition Secured Parties in the Pre-Petition Collateral, including the Cash Collateral, as security for the Pre-Petition Secured Obligations, constitute valid, binding, enforceable and properly perfected liens and security interests and are not subject to any challenge or defense including, without limitation, impairment, recoupment, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, attack, offset, counterclaim, cross-claim, Claim (as defined in section 101(5) of the Bankruptcy Code) avoidance, disallowance or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except insofar as such liens are subordinated to the DIP Facility Liens and the Carve-Out (as defined below) in accordance with the provisions of this Second Interim Order).  The Debtors further admit, acknowledge and agree that (A) the Pre-Petition Secured Obligations constitute legal, valid and binding obligations of the Debtors, (B) no offsets, defenses, reductions, impairments, grounds for avoidance, recoupments, subordinations or disallowance (whether under the Bankruptcy Code or otherwise), Claims, crossclaims or counterclaims with respect to the Pre-Petition Secured Obligations exist and (C) no portion of the Pre-Petition Secured Obligations is subject to any challenge or defense including, without limitation, impairment, recoupment, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, attack, offset, counterclaim, cross-claim, Claim (as defined in section 101(5) of the Bankruptcy Code) avoidance, disallowance or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(m)The Pre-Petition Secured Parties are entitled, pursuant to sections 105, 361, 362 and 363(e) of the Bankruptcy Code, to adequate protection of their interest in the Pre-Petition Collateral, including any Cash Collateral, for the aggregate amount of diminution in the value thereof following the Petition Date.

(n) Subject to the resolution of any Pre-Petition Lien/Claim Challenge related thereto (as provided in paragraph 11 below and solely with respect to the Pre-Petition Secured Parties), the Debtors and anyone who claims an interest by, through or under their estates forever and irrevocably release, discharge, and acquit the Pre-Petition Secured Parties (each solely in their capacity as such) and the DIP Lender, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (each solely in their capacity as such) of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with or relating to the DIP Facility, DIP Facility Obligations, DIP Loan Documents, Pre-Petition Secured Obligations, Pre-Petition Loan Documents, and/or the transactions contemplated thereunder including, without limitation, (i) any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), so-called "lender liability," claims, counterclaims, cross-claims, recoupment, defenses, disallowance, impairment, or any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity, (ii) any and all claims and causes of action arising under title 11 of the United States Code, and (iii) any and

all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Lender or the Pre-Petition Secured Parties.

(o) The foregoing acknowledgments, stipulations and agreements are subject only to the rights of any official statutory committee appointed in these cases (together with the Equity Committee, a "Committee") and parties in interest pursuant to paragraph 11 below.

G.    Findings Regarding Postpetition Financing.

(a) *Debtors' Request*.  The Debtors have requested from the DIP Lender, and the DIP Lender is willing to extend, certain loans, advances and other financial accommodations, as more particularly described and on the terms and conditions set forth in this Second Interim Order and the DIP Facility Documents.

(b) *Need for Postpetition Financing*.  The Debtors have a critical need to access the financing provided by  the DIP Facility and use the Pre-Petition Collateral, including the Cash Collateral (as defined herein), in order to permit, among other things, the orderly continuation of the operation of their business, the management and preservation of Debtors' assets and property, the sale of all or substantially all of the Debtors' assets (the "Proposed Sale") at a sale and an auction of the assets of the Debtors (the "Auction") as further described in the Deschenes Declaration, to maintain business relationships with vendors, suppliers and customers, to make payroll, to satisfy other working capital and operational needs and maintain the going concern value of the Debtors' estates.  Without such cash and credit, the Debtors' estates would be irreparably harmed.

(c) *No Credit Available on More Favorable Terms*.  The Debtors represent that they are unable to obtain sufficient financing from sources other than the DIP Lender on terms more favorable than under the DIP Credit Agreement (as defined below and in  the form attached

hereto as Exhibit 1, subject only to non-material modifications as may be agreed to by the parties

thereto) and any and all documents and instruments delivered pursuant thereto or in connection

therewith (inclusive of the DIP Credit Agreement, the "DIP Facility Documents") and are not

able to obtain sufficient unsecured credit allowable as an administrative expense under

Bankruptcy Code § 503(b)(1). The Debtors are also unable to obtain sufficient unsecured credit

with the enhanced priority afforded by Bankruptcy Code § 364(c)(1). New credit is unavailable

to the Debtors without providing the DIP Lenders with (a) the Super-Priority Claims and (b) the

DIP Facility Liens as provided herein and in the DIP Facility Documents.

      (d) *Budget*. The Debtors have prepared and delivered the Budget to the DIP

Lender and the Pre-Petition Secured Parties, a copy of which Budget is attached hereto as

Exhibit 2. Such Budget has been thoroughly reviewed by the Debtors and their management.

The Debtors represent that they believe the Budget to be achievable and will allow the Debtors to

operate their business, conduct the Auction and Sale and otherwise conduct their chapter 11

cases. The DIP Lender is relying upon the Debtors' compliance with the Budget in accordance

with the Second Interim Order in determining to enter into the DIP Financing Documents and the

postpetition financing arrangements provided for herein.

      (e) *Cash Collateral*. The Debtors stipulate, agree and acknowledge, subject to the

rights of a Committee or other party in interest pursuant to paragraph 11 below, that their cash,

including, without limitation, all cash and other amounts on deposit or maintained in any account

or accounts by the Debtors, and any amounts generated by the collection of accounts receivable,

the sale of inventory or other disposition of Pre-Petition Collateral, constitute proceeds of the

Pre-Petition Collateral and are cash collateral of the Pre-Petition Secured Parties within the

meaning of Bankruptcy Code § 363(a) (the "Cash Collateral"). The Pre-Petition Secured Parties

are entitled, pursuant to Bankruptcy Code §§ 361, 363(c)(2), 363(e) and 364(d)(1), to adequate protection of their interests in the Pre-Petition Collateral, in an amount equal to the sum of, without duplication, the aggregate amount of diminution in value of the Pre-Petition Collateral, which is a result of, or arises from, or is attributable to, the imposition of the automatic stay, or the use, sale or lease of such Pre-Petition Collateral, or the grant of a lien in favor of the DIP Lender under section 364 of the Bankruptcy Code or otherwise.

(f) The DIP Lender is willing to provide financing to the Debtors, subject to (i) the entry of this Second Interim Order, (ii) the terms and conditions of the DIP Credit Agreement and the DIP Facility Documents, and (iii) findings by the Court that such postpetition financing is essential to the Debtors' estates, that the terms of such financing were negotiated in good faith and at arm's length, and that the DIP Lender's DIP Facility Liens and Super-Priority Claims, and other protections granted pursuant to the First Interim Order (if applicable) this Second Interim Order and the DIP Facility Documents will not be affected by any subsequent reversal, modification, vacatur, or amendment of this Second Interim Order or any other order, as provided in Bankruptcy Code § 364(e).

(g) The First Lien Agent has consented to the DIP Facility, and, pursuant to the Intercreditor Agreement, the Second Lien Lender is deemed to have consented to the DIP Facility and may not, directly or indirectly, contest, protest, or object to the DIP Facility.

(h) *Business Judgment and Good Faith Pursuant to Section 364(e).* Based on the record of the Second Interim Hearing, the terms of the DIP Facility Documents, this Second Interim Order and the use of Cash Collateral are fair, just and reasonable under the circumstances, ordinary and appropriate for secured financing to a debtor-in-possession, reflects the Debtors' exercise of their business judgment and constitute reasonably equivalent value and

fair consideration. The use of Cash Collateral and the terms of the DIP Credit Agreement and the other DIP Facility Documents have been negotiated in good faith and at arm's length among the Debtors, DIP Lender and the Pre-Petition Secured Parties, with all parties represented by counsel, and any credit extended, loans made, and other financial accommodations extended to the Debtors by DIP Lender shall be deemed to have been extended, issued, or made, as the case may be, in "good faith" as that term is used in Bankruptcy Code § 364(e) and in express reliance upon the protections afforded by Bankruptcy Code § 364(e) in the event that this Second Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(i) *Good Cause*. The Debtors represent that the relief requested by the Motion is necessary, essential and appropriate and is in the best interests of and will benefit the Debtors, their estates and their creditors as its implementation will, among other things, provide the Debtors with the necessary liquidity to (i) minimize disruption to the Debtors' businesses and on-going operations, including in connection with the Proposed Sale, (ii) preserve and maximize the value of the Debtors' estates for the benefit of all of the Debtors' creditors, and (iii) avoid immediate and irreparable harm to the Debtors, their creditors, their business, their employees, and assets. Thus, good cause has been shown for the entry of this Second Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).

Based upon the foregoing and after due consideration and good cause appearing therefor:

IT IS ORDERED, ADJUDGED AND DECREED, that:

1. <u>Motion Granted</u>. The Motion is granted, on a second interim basis, in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Second Interim Order. This Second Interim Order shall immediately become effective upon its entry.

2. <u>Objections Overruled</u>. All objections to the entry of this Second Interim Order are withdrawn or resolved by the terms hereof or, to the extent not resolved, are overruled.

3.  <u>Authorization of the DIP Financing Documents</u>.  Provided that the Debtors are not in default under the terms of this Second Interim Order and the DIP Facility Documents, the Debtors are immediately authorized to use the Pre-Petition Secured Parties' Cash Collateral and to borrow from the DIP Lenders in an interim amount not to exceed $5,700,000, in accordance with the terms of this Second Interim Order and that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement (as amended, the "<u>DIP Credit Agreement</u>") by and between the Debtors and the DIP Lender (subject only to non-material modifications as may be agreed to by the parties thereto), and the DIP Credit Agreement and the DIP Facility Documents are hereby deemed to be legal, valid, and binding obligations of the Debtors and the Debtors' estates.  Until the Final Hearing on the Motion, Cash Collateral and available financing and advances under the DIP Credit Agreement will be used or made only in accordance with the Budget (including any variances permitted by the DIP Facility Documents) and this Second Interim Order.  The Debtors are hereby authorized and directed to pay, upon the closing of the DIP Facility, all principal, accrued interest, unpaid fees and expenses and all other amounts due as of the closing of the DIP Facility to DIP SPV I, L.P. in accordance with the terms and conditions of that certain postpetition financing granted by the First Interim Order.

4.  <u>Execution and Compliance with DIP Facility Documents</u>. The Debtors are authorized and directed to execute, deliver, perform and comply with all of the terms and covenants of the DIP Credit Agreement and DIP Facility Documents, each of which, without limitation, constitute valid, binding, enforceable and non-avoidable obligations of the Debtors for all purposes during the Chapter 11 Cases, any subsequently converted case of the Debtors under Chapter 7 of the Bankruptcy Code or after the dismissal or reorganization of the Chapter 11 Cases.

5.  [<u>intentionally omitted</u>].

6. <u>Super-Priority Claims</u>. As protection for the DIP Facility Obligations now existing or hereafter arising pursuant to the DIP Facility, the DIP Facility Documents and this Second Interim Order, to the extent the DIP Facility Liens do not satisfy the DIP Facility Obligations, the DIP Lender is granted allowed super-priority administrative claims pursuant to Bankruptcy Code § 364(c)(1), which claims shall have priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, now in existence or hereafter incurred by the Debtors and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), and/or 364(c)(1) (the "<u>Super-Priority Claims</u>"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, <u>provided</u>, <u>however</u>, that the Super-Priority Claims shall be subordinate only to the Carve-Out to the extent specifically provided for in paragraph 9 of this Second Interim Order and provided further that the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code ("<u>Avoidance Actions</u>") shall not be made available to pay the Super-Priority Claims.

7. <u>DIP Facility Liens</u>. As security for the DIP Facility Obligations, but subject to the Carve-Out, pursuant to Bankruptcy Code §§ 364(c)(2), (c)(3), and (d) and by the consent of the Pre-Petition Secured Parties, the DIP Lender is hereby granted (effective and perfected upon the date of the Second Interim Order and without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, control agreements, pledge agreements, lock box agreements, financing statements, or otherwise) the DIP Facility Liens in the Collateral:

(a)      pursuant to Bankruptcy Code § 364(c)(2), but subject to the Carve-Out, valid, perfected, enforceable and non-avoidable first priority liens on and security interests, in all now owned or hereafter acquired assets and property of the Debtors,

(b)      pursuant to Bankruptcy Code § 364(c)(3), valid, perfected, enforceable and non-avoidable second priority or other junior liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors that are subject to the Permitted Liens or to valid liens in existence on the Petition Date that are perfected subsequent to such commencement as permitted by Bankruptcy Code § 546(b) (other than assets and property that are subject to the existing liens as referred to in subparagraph (c) below, which existing liens shall be primed as provided therein); and

(c) pursuant to Bankruptcy Code § 364(d), but subject to the Carve-Out, valid, perfected, enforceable and non-avoidable first priority senior priming liens and security interests in all now owned or hereafter acquired assets and property of the Debtors, including without limitation, the Pre-Petition Collateral, subject and subordinate only to (i) the Permitted Liens, including the liens of Bridge Bank, N.A. and its successor Western Alliance Bank ("Bridge Bank") under that (a) certain Standby Letter of Credit Agreement, dated as of April 2, 2010, between the Debtors and Bridge Bank for obligations of up to $312,445.35 (plus interest) and (b) certain VISA Commercial Credit Card Assignment of Deposit, dated as of April 9, 2015, between the Company and Bridge Bank for obligations of up to $55,000 (plus interest), and (ii) the Carve-Out.

The Debtors are expressly prohibited from taking any action to increase any amount due and owing on account of a Permitted Lien and may not convey, pledge, encumber, sell, lease, license, assign, transfer or otherwise dispose of their receivables.  In the event of the occurrence

of an Event of Default (as defined below), or an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default (a "Default"), the DIP Facility Liens shall be subject only to the Permitted Liens and the payment of the Carve-Out (as defined below).

Further, the Debtors are hereby authorized and directed to pay to the DIP Lender all outstanding and future costs, fees, charges and expenses of the DIP Lender to the extent provided in the DIP Facility Documents following receipt of all invoices relating to the same (which may be redacted for privilege), including all reasonable fees and expenses of consultants, advisors, professionals and attorneys whether incurred pre-petition or post-petition (the "DIP Lender Costs"). None of such DIP Lender Costs shall be subject to Court approval, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court, provided that the Court shall have jurisdiction to determine any dispute concerning such invoices. The DIP Lender shall provide a copy of all invoices of the DIP Lender Costs for which they seek payment from the Debtors to the U.S. Trustee and any Committee's counsel subject to confidentiality and applicable privilege, who shall have ten (10) days to review and file and objections to the same, *provided however,* that the Closing Fee and the Exit Fee (as such terms are defined in the DIP Facility) are not subject to any review and the Debtors are authorized and directed to pay such Closing Fee and Exit Fee when due in accordance with the DIP Facility. The DIP Lender Costs and, prior to the closing of the DIP Facility, the costs of DIP SPV I, L.P. shall not be subject to the budget variance testing set forth in the DIP Credit Agreement.

8. <u>Adequate Protection</u>.  The Pre-Petition Secured Parties are entitled to adequate protection for the Debtors' use of the Pre-Petition Collateral, including any Cash Collateral.  As adequate protection, the Pre-Petition Secured Parties are hereby granted the following:

(a) *Replacement Liens*.  To the extent of the aggregate amount of diminution in value of Pre-Petition Collateral, the First Lien Agent and Second Lien Lenders are granted (effective and perfected upon the entry of the First Interim Order and without the necessity of the execution by the Debtors of security agreements, financing statements or other agreements) valid, perfected replacement security interests in and liens upon the Collateral, proceeds of Avoidance Actions, and all Pre-Petition Collateral of the Debtors and the proceeds thereof (the "<u>Adequate Protection Liens</u>"), subject and subordinate only to (i) the DIP Facility Liens granted to the  DIP Lender under this Second Interim Order and pursuant to the DIP Facility Documents; (ii) the Permitted Liens, including the liens of Bridge Bank, N.A. under that (a) certain Standby Letter of Credit Agreement, dated as of April 2, 2010, between the Debtors and Bridge Bank for obligations of up to $312,445.35 (plus interest) and (b) certain VISA Commercial Credit Card Assignment of Deposit, dated as of April 9, 2015, between the Company and Bridge Bank for obligations of up to $55,000 (plus interest); (iii) the Carve-Out; and (iv) solely in the case of the Second Lien Lenders, to the Adequate Protection Liens of the First Lien Agent and to any valid, perfected, and unavoidable liens held by the First Lien Agent on account of the Pre-Petition First Lien Obligations.

(b) *Superpriority Claims.*  To the extent of aggregate amount of diminution in value of Pre-Petition Collateral, allowed, superpriority administrative expense claims against the Debtors pursuant to sections 503(b) and 507(b) of the Bankruptcy Code (the "<u>Adequate Protection Claims</u>") that are junior in priority only to (i) the Carve-Out; (ii) the DIP Facility

super-priority claims; (iii) the Expense Reimbursement and Break-Up Fee, as such terms are defined in that certain Asset Purchase Agreement by and between the Debtors and L-3 Communications Corporation, dated as of October 10, 2016, as amended, to the extent such Expense Reimbursement or Break-Up Fee are authorized by this Court; and (iv) in the case of the Second Lien Lenders, to the Adequate Protection Claims of the First Lien Agent. For the avoidance of doubt, no payment shall be made on account of any Pre-Petition Secured Obligation until such time as (x) the DIP Lender's obligations have been terminated and (y) the DIP Facility Obligations have been indefeasibly paid in full.

(c) *Budget/Reporting.* Except pursuant to permitted variances provided for in the DIP Facility Documents, the Debtors shall not make disbursements in excess of those projected in the Budget and shall not otherwise deviate from the terms of the Budget, (i) without the written consent of the DIP Lender and the First Lien Agent and (ii) except with respect to Budget line items concerning reimbursement of expenses, including legal fees and enforcement rights, in connection with the DIP Facility. The Debtors shall provide the same written reporting to the Pre-Petition Secured Parties as is provided to the DIP Lender pursuant to the terms of this Second Interim Order and the DIP Credit Agreement. The DIP Lender and the Pre-Petition Secured Parties shall have reasonable access to the Debtors' management and books and records to monitor the Debtors' operations and the progress of these cases.

(d) *Fees and Expenses.* All interest, fees, and other expenses (including reasonable attorneys' fees) of the Pre-Petition Secured Parties allowed pursuant to the terms of the Pre-Petition Loan Documents shall continue to accrue, subject to the terms of section 506(b) of the Bankruptcy Code. The Debtors are hereby authorized and directed to pay the First Lien Agent all reasonable fees and expenses of attorneys, whether incurred pre-petition or post-

petition, up to a maximum of $100,000. None of such costs shall be subject to Court approval, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court, provided that the Court shall have jurisdiction to determine any dispute concerning such invoices. The First Lien Agent shall provide a copy of all invoices for which it seeks payment from the Debtors to the U.S. Trustee and any Committee's counsel subject to confidentiality and applicable privilege, who shall have ten (10) days to review and file objections to the same.

9. Carve-Out. Notwithstanding anything to the contrary contained herein or in the DIP Facility Documents, all claims and liens granted by the First Interim Order, this Second Interim Order, including the DIP Facility Liens, the DIP Super-Priority Claims, the Adequate Protection Claims and the Adequate Protection Liens, shall be subject and subordinate to the payment of the Carve-Out. For purposes of this Second Interim Order, the "Carve-Out" shall mean, collectively, the sum of (i) all fees required to be paid to the clerk of the Court and all statutory fees payable to the U.S. Trustee under section 1930(a)(6) of title 28 of the United States Code, together with the statutory rate of interest under and 31 U.S.C. § 3717, (ii) reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $15,000, (iii) subject to and not to exceed each line item in the Budget for each Professional (plus any permitted variance under the DIP Facility Documents), all fees, costs, disbursements, charges and expenses incurred at any time before the Carve-Out Trigger Date (as defined below), or any monthly fees payable to estate professionals, in each case, by persons or firms retained by the Debtors or any Committee whose retention is approved by this Court pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code (collectively, the "Professionals," and the fees, costs and expenses of Professionals, the

"Professional Fees"), to the extent such Professional Fees are allowed by this Court at any time (*i.e.*, before or after the Carve-Out Trigger Date) on a final basis; and (iv) all Professional Fees incurred on and after the Carve-Out Trigger Date by Professionals and allowed by this Court at any time, whether by interim order, procedural order or otherwise; provided, that the payment of any Professional Fees of the Professionals (but excluding fees and expenses of third party professionals employed by individual members of a Committee) incurred on or after the Carve-Out Trigger Date and allowed by the Court at any time, on a final basis, shall not exceed $500,000 in the aggregate (the "Professional Expense Cap"); provided, further, that (A) any payments actually made in respect of Professional Fees incurred on or after the Carve-Out Trigger Date and allowed by this Court at any time, on a final basis, shall reduce the Professional Expense Cap on a dollar-for-dollar basis and (B) for the avoidance of doubt, so long as no Carve-Out Trigger Date has occurred, the payment of Professional Fees shall not reduce the Professional Expense Cap. For the purposes of the foregoing, "Carve-Out Trigger Date" means the first business day after the delivery of written notice (the "Carve-Out Notice") by the DIP Lender to (1) the U.S. Trustee, (2) the Debtors and counsel for the Debtors, and (3) counsel for any Committee, if appointed of the occurrence and continuance of (x) the Termination Date or (y) a default in accordance with the DIP Facility Documents, in each case, unless such Event of Default or default is cured or waived. In any event, each of the DIP Lender and the Pre-Petition Secured Parties reserves the right to review and object to any fee statement, interim application or monthly application issued or filed by estate professionals. Any funding or payment of the Carve-Out shall be added to, and made a part of, the DIP Obligations and shall be otherwise entitled to the protections granted under the First Interim Order, this Second Interim Order, the DIP Loan Documents, the Bankruptcy Code, and

applicable law, provided, further, the Carve-Out cannot be used for the payment or reimbursement of any fees or disbursements of the Debtors or any Committee or any other party-in-interest incurred in connection with the assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief: (a) invalidating, setting aside, avoiding, subordinating, in whole or in part, the DIP Facility Obligations or the Pre-Petition Secured Obligations or lien and security interest securing the DIP Facility Obligations or the Pre-Petition Secured Obligations; or (b) preventing, hindering or delaying, whether directly or indirectly, the assertion by the Pre-Petition Lenders or the DIP Lender or enforcement by the Pre-Petition Lenders or the DIP Lender or enforcement by the Pre-Petition Lenders or the DIP Lender of its liens or realization upon any of the respective Collateral or Pre-Petition Collateral; or (c) challenging the postpetition liens or claims seeking an affirmative recovery from the Pre-Petition Lenders or the DIP Lenders; provided, further, that the Carve-Out may be used solely by a Committee to investigate the Pre-Petition Secured Obligations and the validity and perfection of the liens and security interests securing the Pre-Petition Secured Obligations in an amount not to exceed $50,000.00.

10. Fees and Expenses of Professionals. So long as no Carve-Out Trigger Date shall have occurred and be continuing or have occurred and be waived, the Debtor shall be permitted to pay the compensation and reimbursement of fees and expenses, consistent with the Budget (plus any permitted variance under the DIP Facility Documents), payable through interim compensation procedures approved by the Court or allowed by the Court upon application on notice to parties in interest, and payable in accordance with the separate line items in the Budget (plus any permitted variance under the DIP Facility Documents) for each Professional

under Bankruptcy Code §§ 328, 330 and 331, as the same may be due and payable and as are otherwise permitted under this Second Interim Order, the DIP Credit Agreement or other order of the Court.  Nothing contained herein is intended to constitute, nor should be construed as consent to the allowance of any fees, disbursements or expenses by any party and nothing herein shall affect the ability or right of the Debtor, the DIP Lender, the Pre-Petition Secured Parties, any Committee, the U.S. Trustee or any other party in interest to object to the allowance and payment of any amounts incurred or requested.

11. <u>Pre-Petition Lien/Claim Challenge</u>.  The stipulations and admissions contained in the First Interim Order and this Second Interim Order shall be binding upon the Debtors and their estates in all circumstances.  Subject to the terms of this paragraph, a Committee or another party in interest with the requisite standing (including any chapter 7 trustee that may be appointed or elected prior to the deadline to commence a Pre-Petition Lien/Claim Challenge (as defined below), or thereafter for the duration of any litigation commenced by the filing of a complaint on or prior to the deadline to commence a Pre-Petition Lien/Claim Challenge) shall commence any adversary proceeding with respect to the validity, priority, extent, perfection, and enforceability of the Pre-Petition Secured Liens or the Pre-Petition Secured Obligations, or any other claims or causes of action against the Pre-Petition Secured Parties relating to the Pre-Petition Loan Documents (a "<u>Pre-Petition Lien/Claim Challenge</u>") by no later than the earlier of (i) December 23, 2016 for the Equity Committee; (ii) 75 days from the Petition Date for all other parties-in-interest (collectively, the "<u>Pre-Petition Lien/Claim Challenge Termination Date</u>"); and (iii) the closing of the Sale or Alternative Transaction (collectively, the "<u>Pre-Petition Lien/Claim Challenge Termination Date</u>").  If such a Pre-Petition Lien/Claim Challenge is not commenced by the Pre-Petition Lien/Claim Challenge Termination Date, (a) paragraph F of this Second

Interim Order shall be irrevocably binding on the estate, any Committee and all parties in interest (including without limitation a receiver, administrator, or trustee appointed in this case or in any jurisdiction), (b) the Pre-Petition Secured Liens upon and security interests in the Pre-Petition Collateral and Collateral, as the case may be, shall be recognized and allowed as valid, binding, in full force and effect, not subject to any claims, counterclaims, setoff or defenses and perfected, (c) any Committee and any other party in interest (including without limitation a receiver, administrator, or trustee appointed in this case or in any jurisdiction) shall thereafter be forever barred from bringing any Pre-Petition Lien/Claim Challenge, and (d) all of the of Debtors' acknowledgements, releases and waivers of claims granted to or in favor of the Pre-Petition Secured Parties in accordance with this Second Interim Order, including those in paragraph F(l) hereof, shall be binding upon all parties-in-interest in the Chapter 11 Cases and/or in any subsequently converted case(s) under chapter 7 of the Bankruptcy Code.  Nothing in this Second Interim Order shall be deemed to confer or deny standing to commence an action to any Committee or any other party in interest.

12.  Waiver of 506(c) Claims Against the Pre-Petition Secured Parties and the DIP Lender.  Except for the Carve-Out, no costs or expenses of administration which already have been, or may hereafter be, incurred in the Debtors' chapter 11 Cases or in any subsequently converted case under Chapter 7 of the Bankruptcy Code shall be charged or asserted by the Debtors against the Pre-Petition Secured Parties or the DIP Lender, their claims, Pre-Petition Collateral or the Collateral, pursuant to Bankruptcy Code §§ 105 or 506(c) or otherwise except as provided for in the DIP Credit Agreement.

13.  Right to Credit Bid/Distribution of Sale Proceeds.  The Debtors stipulate and agree that the DIP Lender and, unless otherwise ordered by the Court, each of the Pre-Petition Secured

Parties shall have the right to credit bid at any sale or auction in accordance with and subject to section 363(k) of the Bankruptcy Code.

14. <u>Restrictions on Use of Proceeds</u>.  For the avoidance of doubt, except as provided in paragraph 9 of this Second Interim Order, no proceeds of any DIP Loans or any Cash Collateral shall be available for any fees or expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against (i) the DIP Lender or the Pre-Petition Secured Parties, or (ii) in connection with challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating, in whole or in part, or taking or attempting to take any other action to render unenforceable, the Pre-Petition Secured Parties or DIP Lender's liens, claims, interests and adequate protection, as secured creditors of the Debtors as of the Petition Date.

15. <u>Termination Date</u>.  The DIP Facility Obligations shall be due and payable, without notice or demand, on the Termination Date (as defined in Section 3.3(a) of the DIP Credit Agreement).

16. <u>Lien Perfection</u>.  This Second Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of all of the liens and security interests in and upon the Collateral granted pursuant to this Second Interim Order and/or the DIP Facility Documents, without the necessity of (a) filing, recording or serving any financing statements, mortgages, deeds of trust or other agreements, documents or instruments which may otherwise be required under federal or state law in any jurisdiction (collectively, the "<u>Lien Recording Documents</u>"), (b) taking possession of Collateral or evidence thereof (provided, that, without limiting the foregoing, any third party in possession of any Collateral is hereby deemed a bailee for the benefit of and on behalf of the DIP Lender) or (c) taking any other action to validate or

perfect the liens and security interests granted in  this Second Interim Order and/or the DIP

Facility Documents.  If the DIP Lender shall, in its discretion, elect for any reason to file any

such Lien Recording Documents with respect to such liens and security interests, the Debtors are

authorized and directed to execute, or cause to be executed, all such Lien Recording Documents

upon the DIP Lender's request and the filing, recording or service thereof (as the case may be) of

such Lien Recording Documents shall be deemed to have been made at the time of and on the

Petition Date.  The DIP Lender may, in its discretion, without seeking modification of the

automatic stay under Bankruptcy Code § 362, file a certified copy of this Second Interim Order

in any filing or recording office in any county or other jurisdiction in which the Debtors have an

interest in real or personal property and, in such event, the subject filing or recording officer is

authorized to file or record such certified copy of this Second Interim Order.  To the extent that

any applicable non-bankruptcy law would otherwise restrict the grant, scope, enforceability,

attachment or perfection of the liens and security interests authorized or created hereby, or

otherwise would impose filing or registration requirements with respect thereto, such law is

preempted to the maximum extent permitted by the Bankruptcy Code, applicable federal law,

and the judicial power of this Court (provided that if the DIP Lender takes steps to perfect its

liens and security interests under otherwise applicable state law, it does so without waiving the

benefits of this provision of this Second Interim Order).  In the event that any Lien Recording

Document which the DIP Lender elects to file in accordance with this paragraph contains any

limitations, defects, deficiencies or other information which might otherwise limit or adversely

affect the DIP Lender's liens upon and security interests in the Collateral or any of the DIP

Lender's claims, rights, priorities and/or protections afforded under this Second Interim Order

and/or the DIP Facility Documents, such limitations, defects, deficiencies or other information

shall not impair, limit, restrict or adversely affect in any way any of the DIP Lender's liens and security interests in the Collateral or its claims, rights, priorities and/or protections granted under this Second Interim Order and/or the DIP Facility Documents.

17. <u>Modification of Automatic Stay</u>.  Subject only to the provisions of the DIP Facility Documents and without further order from this Court, the automatic stay provisions of Bankruptcy Code § 362 are vacated and modified to the extent necessary to permit the DIP Lender to implement the provisions of the DIP Facility Documents and this Second Interim Order including exercising, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in the DIP Facility Documents; <u>provided</u>, <u>however</u>, that the automatic stay shall not be deemed vacated and modified with respect to the exercise by the DIP Lender of any rights or remedies with respect to the Collateral following an Event of Default unless and until the DIP Lender has given the Debtors, the Pre-Petition Secured Parties, any Committee and the Office of the United States Trustee at least four (4) Business Days prior notice of the DIP Lender's intention to exercise such remedies.  Notwithstanding the occurrence of an Event of Default or the Termination Date or anything herein, all of the rights, remedies, benefits, and protections provided to the DIP Lenders under the DIP Facility Documents and this Second Interim Order shall survive the Termination Date.  Notwithstanding anything to the contrary herein, from and after the occurrence of an Event of Default, the First Lien Agent and any of its designees or affiliates shall have the option to satisfy the DIP Facility Obligations in full, in which case the First Lien Agent shall be subrogated, and otherwise entitled, to all of the rights, claims, and interests of the DIP Lender under this Second Interim Order and the DIP Facility Documents, *provided however* that the DIP Lender's enforcement rights are expressly and fully preserved until such time as the DIP Facility Obligations are indefeasibly paid in full.

18. <u>Binding Effect of Second Interim Order and DIP Facility Documents</u>.

(e)    It shall be an Event of Default under the DIP Facility Documents for the Debtors to file any pleadings seeking any modifications or extensions of this Second Interim Order without the prior written consent of the DIP Lender as authorized under the DIP Credit Agreement to give such consent, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Lender.

(f) The provisions of this Second Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered converting these chapter 11 cases to a chapter 7 case or cases, dismissing the Debtors' bankruptcy case (in the case of such dismissal, to the maximum extent permitted under the Bankruptcy Code and other applicable law) or any order which may be entered confirming or consummating any plan of reorganization of the Debtors; and the terms and provisions of this Second Interim Order as well as the priorities of payment, liens, and security interests granted pursuant to this Second Interim Order and the DIP Facility Documents shall continue in this or any superseding Chapter 7 case under the Bankruptcy Code, and such priorities of payment, liens and security interests shall maintain their priority as provided by this Second Interim Order until all Obligations are indefeasibly paid and satisfied in full.

(g) The provisions of this Second Interim Order and the DIP Facility Documents shall be binding upon and inure to the benefit all parties-in-interest in this case, including, without limitation, the Debtors, DIP Lender, the Pre-Petition Secured Parties and any Committee, and their respective successors and assigns (including, to the fullest extent permitted by applicable law, any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the Debtors' estates, an examiner appointed pursuant to Bankruptcy Code § 1104 (subject to entry of

a Final Order) or any other fiduciary hereafter appointed as a legal representative of the Debtors or with respect to the property of the Debtors' estates); provided, however, that DIP Lender shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the Debtors' estates.

19. <u>Survival</u>.  The rights of the DIP Lender under the DIP Facility Documents or this Second Interim Order, the provisions of this Second Interim Order and any actions taken pursuant hereto shall survive the entry of any order (i) confirming a plan or plans of reorganization in this case (and, to the extent not satisfied in full in cash, the DIP Facility Obligations shall not be discharged by the entry of any such order, or pursuant to Bankruptcy Code § 1141(d)(4), the Debtors having hereby waived such discharge); (ii) converting any of the Cases to a chapter 7 case; or (iii) dismissing any of the Cases, and the terms and provisions of this Second Interim Order as well as the Super-Priority Claims and the DIP Facility Liens granted to and conferred upon the DIP Lender and the protection afforded to the DIP Lender pursuant to this Second Interim Order and the DIP Facility Documents shall continue in full force and effect notwithstanding the entry of any such order, and such claims and liens shall maintain their priority as provided by this Second Interim Order and the DIP Facility Documents and to the maximum extent permitted by law until all of the DIP Facility Obligations shall have been paid and satisfied in full in accordance with the provisions of the DIP Credit Agreement (and that such DIP Facility Liens, Super-Priority Claims and other protections shall remain binding on all interested parties).

20. <u>Nullifying Pre-Petition Restrictions on Post-Petition Lien Grants</u>.  Subject solely to the entry of the Final Order, notwithstanding anything to the contrary contained in any pre-petition agreement, contract, lease, document, note or instrument to which the Debtors are a

party or under which the Debtors are obligated, any provision that restricts, limits or impairs in any way the Debtors' ability or right to grant liens or security interests upon any of the Collateral (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which the Debtors are a party) under the DIP Facility Documents or this Second Interim Order or otherwise enter into and comply with all of the terms, conditions and provisions thereof (all such provisions being collectively referred to as the "Restrictive Clauses") shall not be effective and shall be unenforceable against the Debtors, the DIP Lender, and the Pre-Petition Secured Parties to the maximum extent permitted under the Bankruptcy Code and other applicable law, but only with respect to the entry of this Second Interim Order granting such postpetition financing, and, therefore, shall not adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted to the DIP Lender pursuant to this Second Interim Order and/or the DIP Facility Documents or any of the rights of the DIP Lender hereunder or thereunder to the maximum extent permitted under the Bankruptcy Code and other applicable law.

21. After-Acquired Property. Except as otherwise provided in this Second Interim Order, pursuant to Bankruptcy Code § 552(a), all property acquired by the Debtors after the Petition Date, including, without limitation, all Collateral pledged or otherwise granted to the DIP Lender, pursuant to the Debtors' use of Cash Collateral, the DIP Facility Documents and this Second Interim Order, is not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date which is not subject to

subordination under Bankruptcy Code §510(c) or other provisions or principles of applicable law.

22. <u>Amendment to DIP Facility Documents</u>. The DIP Lender, with the consent of the Debtors, is authorized to amend and/or modify the DIP Credit Agreement or any other DIP Facility Documents without further order of the Court; <u>provided</u> that any such amendments or modifications must be in writing and served upon counsel for any Committee (if appointed at such time), the Pre-Petition Secured Parties and the U.S. Trustee and shall be filed with the Court; <u>provided, further</u> that any amendments or modifications that would have the effect of shortening the Termination Date of the DIP Facility or modifying (i) the aggregate fees payable, or (ii) the rate or amount of interest payable, under the DIP Facility Documents, or which are otherwise materially adverse to the Debtors, shall be done only pursuant to further order of the Court upon a motion on notice to the any Committee (if appointed at such time), the U.S. Trustee, the Pre-Petition Secured Parties and all parties who filed requests for notices under Bankruptcy Rule 9010(b) or are entitled to notice under Bankruptcy Rule 2002. Any amendment or modification to increase the aggregate amount of borrowings permitted shall only be done pursuant to further order of the Court upon a motion on notice to any Committee (if appointed at such time), the Pre-Petition Secured Parties, Simpson Thacher & Bartlett LLP (as counsel to L-3 Communications Corporation), the U.S. Trustee, and all parties who filed requests for notices under Bankruptcy Rule 9010(b) or are entitled to notice under Bankruptcy Rule 2002.

23. <u>Insurance Policies</u>. The DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the Debtors which in any way relates to the Collateral. The Debtors shall request that the holders of all property policies pursuant to which any of the Debtor is an additional

named insured, if any, name the DIP Lender as an additional insured or loss payee of the insured parties, in case of loss.

24. <u>Remedies upon Occurrence of Event of Default</u>. In the event of any of the following: (a) the failure of the Debtors to perform in any material respect any of its obligations pursuant to this Second Interim Order, (b) the occurrence and continuation of any "Event of Default" as defined under the DIP Credit Agreement or the other DIP Facility Documents, (c) the termination or non-renewal of the DIP Facility Documents as provided for in the DIP Credit Agreement, or if terminated sooner by an order of this Court, or (d) any termination events occurring under the DIP Credit Agreement (each of the foregoing being referred to in this Second Interim Order, individually, as an "<u>Event of Default</u>" and collectively, as the "<u>Events of Default</u>"); then (unless (i) such Event of Default is specifically waived in writing by the DIP Lender as provided for in the DIP Facility Documents, which waiver shall not be implied from any other action, inaction or acquiescence by such the DIP Lender, or (ii) cured by the Debtors within four (4) business days (or, if longer, such period of time expressly provided in the DIP Facility Documents) of being provided written notice thereof by the DIP Lender) the DIP Lender may take any or all of the following actions, without prejudice to the rights of the DIP Lender to enforce its claims against the Debtors:  (i) terminate or reduce the advances or commitments, whereupon the advances or commitments shall immediately be terminated or reduced, (ii) declare all or a portion of the DIP Loan then outstanding to be due and payable, whereupon all or such portion of the aggregate principal of such DIP Loans, all accrued and unpaid interest thereon, all fees and all other amounts payable under DIP Facility Documents and all other DIP Obligations shall become immediately due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Debtors and

(iii) exercise any and all of its other rights and remedies hereunder, under the DIP Facility Documents, under applicable law and otherwise; provided, however, notwithstanding anything to the contrary contained herein, the DIP Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Debtors in the Collateral only upon four (4) Business Days' prior notice to the Debtors, the U.S. Trustee, the Pre-Petition Secured Parties and counsel for any Committee of the DIP Lenders' intention to exercise such remedies.

25. <u>Collateral Rights</u>.    Until all of the DIP Facility Obligations shall have been indefeasibly paid and satisfied in full in immediately available funds and without further order of the Court:

(h)    In the event that any party who holds a lien or security interest in any of the Collateral that is junior and/or subordinate to the liens and claims of the DIP Lender (including, but not limited to the Pre-Petition Secured Parties) in such Collateral receives or is paid proceeds of the Collateral prior to the indefeasible payment and satisfaction in full of all Obligations, such junior or subordinate lienholder shall be deemed to have received, and shall hold, such Collateral proceeds in trust for the DIP Lender and shall immediately turnover to the DIP Lender such proceeds for application to the Obligations in accordance with the DIP Facility Documents, and/or this Second Interim Order;

(i)    Upon the acceleration of the DIP Facility Obligations following an Event of Default, and subject to the DIP Lender providing the notice required by this Second Interim Order or the DIP Credit Agreement, in connection with a liquidation of any of the Collateral, the DIP Lender (or any of its employees, agents, consultants, contractors or other professionals) shall have the right, at the cost and expense of the Debtors to be added to the Obligations, to: (i) enter upon, occupy and use any personal property, fixtures and equipment owned or leased by the

Debtors and (ii) use any and all trademarks, tradenames, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien of any third party and which are used by the Debtors in its business; and

(j) Only to the extent allowable by applicable non-bankruptcy law, upon the acceleration of the DIP Facility Obligations following an Event of Default, and subject to the DIP Lender providing the notice required by this Second Interim Order, as well as four (4) Business Days' notice to the Debtors' real property lessor of the DIP Lender's intention to enter onto or into such lessor's leased premises to remove or otherwise dispose of any Collateral belonging to the Debtors located at such leased premises in accordance with the terms of this paragraph, the DIP Lender shall have the right, and subject to the other rights of the DIP Lender provided herein, following the expiration of such four (4) Business Days' notice period described in this paragraph, to enter onto or into such leased premises for the purpose of removing the Collateral from the leased premises or selling such Collateral belonging to the Debtors at the leased premises, in each case subject to (i) the applicable terms of such Debtors' leases and other agreements with such lessor to the extent enforceable or effective under the Bankruptcy Code and applicable law, (ii) such other agreements between the DIP Lender and the lessor, or (iii) further order of the Court.

26. <u>Limitation of Liability</u>.  Nothing in this Second Interim Order or the DIP Facility Documents shall in any way be construed or interpreted to impose, or allow the imposition upon the DIP Lender of, any liability for any claims arising from the prepetition or postpetition activities by the Debtors in the operation of their business or in connection with their restructuring efforts.

27. <u>No Modification or Stay of Second Interim Order</u>.  If any or all of the provisions of this Second Interim Order or the DIP Credit Agreement are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect (a) the validity of any obligation, indebtedness or liability incurred by the Debtors to the DIP Lender prior to the effective date of such modification, vacation or stay, or (b) the validity or enforceability of any security interest, lien, or priority authorized or created hereunder or pursuant to the DIP Facility Documents, as applicable.

28. <u>Good Faith</u>.  The terms of the financing arrangements among the Debtors and DIP Lender have been negotiated in good faith and at arms' length among the Debtors and the DIP Lender and any loans, advances or other financial accommodations which are made are deemed to have been made and provided in good faith, as the term "good faith" is used in Bankruptcy Code § 364(e), and shall be entitled to the full protection of Bankruptcy Code § 364(e).

29. <u>No Marshaling</u>.  The DIP Lender and the Pre-Petition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral.

30. <u>Section 552(b)</u>.  Each of the Pre-Petition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Pre-Petition Secured Parties, with respect to the proceeds, product, offspring or profits of any of the Collateral.

31. <u>Final Hearing and Objection Date</u>.  This matter is set for a Final Hearing on November 29, 2016, at 11:30 a.m. (ET), in the United States Bankruptcy Court for the District of Delaware.  The Debtors shall promptly mail copies of this Second Interim Order to (a) the Notice

Parties, (ii) all parties who filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002, (iii) counsel selected by a Committee, if formed, upon its formation if selected by such date, (iv) the Internal Revenue Service and all state taxing authorities to which the Debtors pay taxes; (v) those other creditors known to the Debtors who may have liens upon or perfected security interests in any of the Debtors' assets and properties; (vi) the U.S. Attorney for the District of Delaware; (vii) the Delaware Attorney General; (viii) all persons and entities from which the Debtors leases real property, equipment, or other personal property (including intellectual property); and (ix) the list of thirty largest unsecured Creditors. Objections to the entry of the Final Order shall be in writing and shall be filed with the Clerk of this Court, on or before November 22, 2016, at 4:00 p.m., with a copy served upon: (i) counsel for the Debtors: Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Paul V. Shalhoub; (ii) counsel for the DIP Lender: Sheppard Mullin Richter & Hampton LLP, 30 Rockefeller Plaza, New York, NY 10112, Attn: Craig A. Wolfe and Jason R. Alderson; (iii) Counsel to the First Lien Agent: Pachulski Stang Ziehl & Jones LLP, 919 N. Market St, 17th Floor, Wilmington, DE 19801, Attn: Jeffrey N. Pomerantz, Esq., Ira D. Kharasch, Esq., and Peter J. Keane, Esq.; (iv) Holland & Knight LLP, 31 West 52nd Street, New York, NY 10019, Attn: Barbra R. Parlin. Esq.; (v) counsel for the Equity Committee: Brown Rudnick LLP, Seven Times Square, New York, NY 10036, Attn: William R. Baldiga and Gerard T. Cicero,; and (vi) the Office of the U.S. Trustee for the District of Delaware; 844 King Street, Room 2207, Wilmington, DE 19801. Any objections by creditors or any other party-in-interest to the Motion or any of the provisions of the DIP Facility and Cash Collateral arrangements among the Debtors and the DIP Lender shall be deemed waived unless filed and received in accordance with the foregoing on or before the close of business on such date.

32. Notwithstanding anything to the contrary in this Second Interim Order, the releases, Super-Priority Claims and DIP Facility Liens (as defined in the First Interim Order) granted to DIP SPV I, L.P. in the First Interim Order and described in paragraph E hereto are approved on a final basis. All DIP Facility Obligations (as defined in the First Interim Order), to the extent unpaid at the closing of the DIP Facility, shall be payable pursuant to the First Interim Order and the DIP Facility Documents (as defined in the First Interim Order).

33. <u>Conflicting Provisions</u>. To the extent the terms and conditions of the DIP Facility Documents are in conflict with the terms and conditions of this Second Interim Order, the terms and conditions of this Second Interim Order shall control.

34. <u>Effectiveness</u>. Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of this Second Interim Order shall (a) be immediately enforceable, and (b) not be stayed absent the grant of such stay under Bankruptcy Rule 8007 after a hearing upon notice to the Debtors and the DIP Lender.

Dated: November ___, 2016
      Wilmington, Delaware

Brendan L. Shannon
Chief United States Bankruptcy Judge